Filed 6/11/19

CERTIFIED FOR PUBLICATION

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

FOURTH APPELLATE DISTRICT

DIVISION TWO

| | |
|---|---|
| Estate of ROSCOE SAPP, SR., Deceased. | |
| ARMURESS SAPP et al., | E068030 |
| Petitioners and Respondents, | (Super.Ct.No. PRO067969) |
| v. | OPINION |
| EDITH ROGERS, | |
| Objector and Appellant. | |

APPEAL from the Superior Court of Riverside County. Thomas H. Cahraman, Judge. Affirmed.

Edith Rogers, in pro. per., for Objector and Appellant.

Alexander Law Offices and Thomas M. Alexander, Jr., for Petitioner and Respondent Armuress Sapp.

No appearance for Petitioner and Respondent Brian Lincoln.

1

Edith Rogers appeals from her removal as administrator of the estate of her grandfather Roscoe Sapp, Sr. (decedent), who died in 1994. Armuress Sapp and Brian Lincoln, two of decedent's grandsons, separately petitioned to remove Rogers as administrator. The probate court found Rogers (1) had failed to comply with the court's 2001 instructions that she and her coadministrator (who died in 2003) sell the estate's remaining real estate holdings and distribute the net proceeds to the beneficiaries of the decedent's will; and (2) acted in bad faith toward the beneficiaries by trying to buy them out for much less than they would have received if she had timely sold the properties. The court therefore concluded Rogers had to be removed because she "mismanaged" the estate and was "incapable of properly executing the duties of the office" of administrator. (Prob. Code,[1] § 8502, subds. (a), (b).) The probate court withdrew letters of administration issued to Rogers and appointed Armuress as special administrator.

In her briefs, Rogers challenges: (1) the 2001 order instructing the coadministrators to sell the estate's real property; (2) the probate court's 2016 denial of her petition for additional instructions; and (3) the 2017 judgment removing her as personal representative. Only the 2017 judgment is properly before this court. Although we conclude the evidence does not support a finding that Rogers was incapable of executing the duties of administrator, we find the evidence supports her removal because she is not otherwise qualified to act as administrator, and she mismanaged the estate.

_____

[1] All undesignated statutory references are to the Probate Code.

2

Because we conclude Rogers has not demonstrated the probate court abused its discretion when it removed her, we affirm the judgment.

I.

FACTS AND PROCEDURAL BACKGROUND[2]

A.      *Early Years of the Estate*, *1994-2000.*

Decedent died on March 20, 1994, and on July 26 of that year the probate court issued letters of special administration to Vivian Macon, decedent's sister.  At the time of his death, decedent was survived by seven children (Gloria Lovett, Robert Sapp, Armelius Sapp, Ronald Sapp, Glenda Sapp, Betty Jo Sapp, & Roscoe Sapp, Jr.).[3]

---

[2]  The history of this estate is long and tortured.  Rogers's 61-page opening brief contains an unhelpful 45-page recitation of virtually every fact and proceeding from this case.  Armuress's respondent's brief, while considerably shorter than the opening brief, is not particularly helpful either because its factual discussion contains no record citations whatsoever.  (See Cal. Rules of Court, rule 8.204(a)(1)(C) ["Each brief must [¶] . . . [¶] [s]upport any reference to a matter in the record by a citation to the volume and page number of the record where the matter appears."].)  Brian Lincoln did not file a respondent's brief.

We will limit our discussion to the basic procedural background and some relevant facts pertaining to the judgment on appeal.  To that end, as our guide, we have relied on the probate court's May 9, 2016 tentative decision, which provides a brief and helpful procedural history of the case.  As discussed further, *post*, the merits of that tentative decision and the probate court's subsequent September 2, 2016 judgment denying Rogers's petition for additional instructions are not properly before this court.  Nevertheless, the probate court referred the reader to that procedural history in its March 13, 2017 tentative decision removing Rogers as administrator.  Therefore, on our own motion, we have deemed the May 9, 2016 tentative decision and the September 2, 2016 judgment to be part of the record on appeal.

[3]  In order to avoid confusion, we will refer to some of the parties by their first name.  We mean no disrespect in doing so.  Additionally, to clarify, *Armelius* was a son of the decedent (and has a son named *Armelius*), while petitioner and respondent

*[footnote continued on next page]*

3

Decedent's daughter, Levonia Holmes, predeceased him. Levonia had five children, including objector and appellant Edith Rogers; Ronald Sapp had three children, including petitioner and respondent Armuress; Betty Jo had four children, including petitioner and appellant Brian Lincoln; and Glenda had two children, including former coadministrator Jennifer Sapp.

A document entitled, "Living Trust of Roscoe Sapp, Sr." (the will), dated November 6, 1993, was deposited with the probate court on August 25, 1994. Decedent left considerable improved and unimproved real property to his living natural children "to share + share alike," and the share of any deceased child was to be divided equally to the deceased child's children. The same day, the probate court granted Macon's petition for letters of administration and overruled a demurrer and objections filed by Rogers. The probate court appointed Macon administrator and issued letters of administration to her on September 8, 1994.

On June 22, 1995, the probate court granted Macon's petition for probate of the will, admitted the will to probate, and on July 13, 1995, issued letters of administration to Macon with will annexed. Macon served as administrator for six years, and in 1998 she survived an attempt by Rogers and other heirs to remove her.

---

*[footnote continued from previous page]*
*[footnote continued from previous page]*
*[footnote continued from previous page]*
*Armuress* was decedent's grandson. We also note that *Armelius*, *Levonia*, and *Betty Jo's* names are spelled several different ways throughout the record.

Undeterred, Rogers again moved to remove Macon as administrator. This time, the probate court removed Macon on July 27, 1999. The court appointed Rogers, Roscoe Sapp, Jr., and Jennifer Sapp as coadministrators, and the following January the court issued special letters of administration to them. On February 7, 2000, the probate court appointed the three as coadministrators, but that July the court removed Jennifer as coadministrator. The court issued letters of administration to Rogers and Roscoe Sapp, Jr., on December 27, 2000.

B. *2001 Petition for Instructions and Ruling that the Coadministrators Sell the Remaining Estate Property*.

On June 22, 2001, the remaining two coadministrators petitioned the probate court for instructions. The petition explained that some of decedent's surviving children were disabled and incapable of caring for themselves. The coadministrators were "uncertain as to what effect to give" the document the court had "deemed to be the Last Will and Testament of the decedent," and they asked for instructions on how to proceed and interpret the will.

According to the petition, one coadministrator believed it was decedent's intent that: real property owned by the estate should be liquidated, with the possible exception of one property to be used as a care facility for disabled heirs; the proceeds of the sales be distributed to those heirs who were capable of caring for themselves; and the remaining assets be used to establish a care facility for heirs who were incapable of caring for themselves. The other coadministrator believed the real property should be sold and the net proceeds distributed to the heirs outright. The living heirs executed documents

5

indicating they consented to and requested all the estate's real property be sold, and the proceeds be distributed equally.

On August 30, 2001, the Honorable Stephen D. Cunnison (Judge Cunnison) granted the petition and directed the coadministrators to "sell the [estate's] property." The court instructed coadministrators' attorney to file proofs of service, and to submit a "formal order." As discussed further, *post*, the attorney never submitted a formal order, and the court never entered one.

C.     *Rogers's Administration of the Estate from 2001 until 2016, and the 2016 Judgment Denying Her Petition for Additional Instructions*.

Coadministrator Roscoe Sapp, Jr., died on May 5, 2003, and on January 24, 2005, the probate court issued amended letters of administration with will annexed to Rogers as sole administrator. In the 14 years following the probate court's 2001 ruling on the coadministrators' petition for instructions, the court had approved the sale of four properties in San Bernardino and approved accounts submitted by Rogers. On February 21, 2014, the probate court set a hearing for July 25, 2014, regarding the filing of a final distribution of the estate's assets. That hearing was continued to December 5, 2014. When Rogers and her attorney failed to submit their petition for final distribution, the probate court issued an order to show cause (OSC) why they should not be sanctioned. Rogers filed a status report on February 5, 2015.

At the March 6, 2015 hearing on the OSC, the Honorable Thomas H. Cahraman (Judge Cahraman) stated he was not inclined to approve Rogers's most recent status report because it broached, but ultimately failed to address, questions about the 2001

6

ruling on the petition for instructions. Judge Cahraman stated the 2001 ruling was "ambiguous," but the proper means to clarify that or any other prior rulings was to petition for additional instructions. Rogers subsequently filed a petition for additional instructions on June 29, 2015. The petition asked the probate court to determine whether the document the court had deemed to be a will was instead a trust and, if it was a will, how Rogers should proceed.

After conducting a hearing on Rogers's petition, Judge Cahraman issued a tentative decision denying the petition. Judge Cahraman noted the 2001 petition for instructions had presented Judge Cunnison with two options: "(1) partial liquidation, partial distribution, and maintenance of a home where heirs unable to properly care for themselves could visit on the weekends or live in as a care facility, or (2) complete liquidation and distribution." After reviewing the minutes and the transcript of the 2001 hearing, Judge Cahraman concluded, "The court ordered the co-administrators to do the latter." (Underscoring omitted.)

Judge Cahraman noted Rogers had at least implicitly requested the probate court set aside the 2001 ruling, but she provided no support for such an order. In light of his interpretation of the 2001 ruling, Judge Cahraman concluded the remainder of Rogers's petition was moot. "There is no need to determine whether the will creates a testamentary trust in light of the August 30, 2001 order to distribute the property outright." Therefore, he denied Rogers's petition and directed her to file "a final accounting and petition for final distribution within 90 days that distributes any

7

remaining real property pro-rata . . . ."  On September 2, 2016, the court entered a judgment denying Rogers's petition for additional instructions.

D.    *Petition to Remove Rogers as Administrator.*

Two of decedent's grandsons, Brian Lincoln and Armuress Sapp, filed separate petitions to remove Rogers as administrator and to be appointed as administrator.  In his trial brief, Armuress argued Rogers "never demonstrated an actual intent to distribute the estate to any of the heirs of Roscoe Sapp," despite being ordered to do just that by Judge Cunnison.  According to Armuress, "none of the heirs have received anything, [and] none of the creditors have been paid."  Armuress argued Rogers had "her own agenda, which is not that of Roscoe Sapp, and that agenda makes her incapable of administering the estate."

1.    *Petitioners' evidence.*

At trial, Armuress introduced testimony from a commercial broker.  Based on his review of the documentation Rogers submitted with her declaration of progress, the expert opined Rogers was not effectively marketing the estate's remaining parcels of real estate because she had removed the properties from active listings, and she had failed to adjust the asking price when the market dropped significantly.  Rogers had the properties listed for a total asking price of more than $9 million, yet the expert testified the property had been on the market for so long that its real value had dropped to just over $6.1 million.  In light of the decrease in property values, the expert testified he considered the property to be "effectively off the market."

8

On cross-examination, the expert testified he did not look at possible mineral surveys of a 73-acre parcel when he made his valuation.

Armuress testified it was his understanding decedent's wishes were to divide his estate evenly between his heirs and their descendants. Rogers told Armuress that if he cooperated with her, he "would get something from the estate," but he "would not get anything if [he] didn't cooperate with her." Armuress testified Rogers told him "it was up to her . . . who gets what in the estate, and if she didn't want [his] father to get anything, he won't get it. And she said that to [Armuress] numerous of times." Rogers told Armuress he should "ask the Court to have the estate removed from probate so that she can control the estate and divide the money. That way it wouldn't be in the Court's hand, and we won't have to worry about the Court."

Armuress also testified that, when he and his siblings petitioned to be conservators of their father Ronald Sapp, Rogers mislead the court by accusing Armuress of being on drugs and keeping his father on drugs. When the heirs and Armuress tried to find out what Rogers had been doing with the estate, Rogers refused to communicate with them. Armuress testified that if he was appointed administrator of the estate, he would follow the probate court's orders and close the estate as quickly as possible. "The heirs are really interested in receiving their inheritance. I would like to fulfill that for the family."

Brian Lincoln testified decedent's intent was to divide his estate evenly between his children. When he spoke to Rogers about the distribution of the estate, she told him "everything was hers and get an attorney." Around 2007, Rogers offered to pay Lincoln and approximately nine other family members $10,000 each "if we just sign off and walk

away." Lincoln believed the estate was worth roughly $8 or $9 million at the time Rogers made the offer. Lincoln saw the offer as "just a slap in [his] face." Lincoln testified he petitioned the court to remove Rogers "because she has not closed this case. She keeps prolonging this and letting this thing go." Lincoln testified he would fully support Armuress if the court appointed him administrator.

Former coadministrator Jennifer Sapp, one of decedent's granddaughters, also testified decedent's intent was to divide his estate evenly between his heirs, and stated Rogers had offered to pay family members $10,000 "just to settle and walk away, leave everything alone."

### 2. Rogers's evidence.

Armelius Sapp, another of decedent's grandsons,[4] testified he was not in agreement with the petitions to remove Rogers as administrator. Armelius testified Rogers had been willing to answer his questions about the administration of the estate, and it was his opinion the estate property that had already been sold was sold for the "highest amount possible." He did not believe a "quick sale" of the remaining estate property was the best way to close the estate. Armelius testified he believed Rogers was doing a reasonable job managing the estate.

A real estate broker retained by Rogers in March 2015 testified she had nine estate properties currently listed. For example, the broker testified the largest parcel, comprising 73 acres, had been listed for $10,240,000 from April 2004 to April 2005. In

---

[4] See footnote 3, *ante*.

2009, the same property was listed for $8,872,800. The parcel was continuously listed for roughly three years, during which time the asking price was further reduced to $1,825,871. When Rogers retained her in March 2015, the broker concluded, based on her research and analysis of the geological surveys and studies of the property, the correct asking price was $5,507,000. Rogers followed the broker's advice and listed the property for that amount.

The broker had received a request from a Chinese company for mineral exploration of the 73-acre property and was in the early stages of negotiations. The broker testified the property had a history of confirmed natural resources deposits (copper and gold), and the requesting party wanted to explore for rare earth minerals known to be found in San Bernardino. The prospective buyer was "willing to pay for the exploration, compensate the family for royalties, and determine a fair market value for this property." The broker testified the exploration might take years, but it would go more quickly with approval by the United States Department of the Interior, Bureau of Land Management. If the contracts were completed, the family would receive compensation during the exploration and receive royalties later. Two other potential buyers had also recently expressed interest in the property.

On cross-examination, the broker testified she had not received any solid offers to explore the property, and no money had been paid to the family yet for mineral exploration on the 73-acre parcel.

### 3. *Tentative decision and judgment.*

On March 13, 2017, the probate court filed a tentative decision granting the petitions to remove Rogers as administrator and appointing Armuress as successor administrator. The court noted 15 and a half years had elapsed since Judge Cunnison instructed Rogers and her coadministrators, "but Ms. Rogers still has not liquidated the remaining parcels." Although Rogers sold four parcels in 2004, in the 12 years that followed she had failed to sell the remaining nine parcels. The court concluded Rogers had "an inherent conflict in handling this estate to conclusion, because she has consistently taken the position that certain language in the will, which could be construed to preclude some beneficiaries from taking outright, is enforceable and should be enforced. In other words, all the way up to the present she has effectively taken the position that the court's final decision in 2001 was wrong." Therefore, the court concluded Rogers was "'incapable of properly executing the duties' of administrator, pursuant to subsection (b) of section 8502 of the Probate Code, because she continues to resist implementation of the court's order."

The probate court also concluded Rogers had acted in bad faith toward the heirs. The testimony that Rogers "tried to buy out various beneficiaries for $10,000 per person," although the properties were worth millions of dollars, "tends to show that she is not capable of acting as an impartial fiduciary." That evidence, according to the court, provided further support for removing Rogers under section 8502, subdivision (b).

Finally, the probate court concluded Rogers should be removed for mismanagement under section 8502, subdivision (a). The court found the weight of the

12

evidence showed the undeveloped parcels were marketable from 2001 onward, yet Rogers did not appear to actively sell them until more recently, when she tried to market them to a Chinese buyer for rare earth mineral exploration. "To tell these beneficiaries to wait some more, while the administrator pursues this hope, is not consistent with the role of probate court, which is to see that cases are administered efficiently and expeditiously. If the 'rare earth' theory proves to have merit (and would be fruitful within a reasonable period) then Armuress Sapp can pursue it as well as Ms. Rogers. Based upon all the evidence, however, the court has concluded that this estate will continue to be prolonged unless we have a change of administrators."

Rogers filed a notice of appeal on March 24, 2017.

On April 6, 2017, the probate court filed formal orders suspending the letter of administration issued to Rogers and appointing Armuress Sapp as special administrator. The same day, the court entered judgment granting the petitions.

II.

DISCUSSION

*A.     Scope of Appeal.*

The parties agree this appeal was properly taken from the probate court's order and judgment removing Rogers as personal representative. However, they disagree about what other rulings this court may review. In other words, there exists a dispute about the scope of this appeal. Because appealability goes to the question of this court's jurisdiction, we must address that threshold question before addressing the merits of

13

Rogers's appeal. (*Olson v. Cory* (1983) 35 Cal.3d 390, 398.) We conclude only the 2017 order and judgment removing Rogers as administrator is properly before us.

1. *2017 judgment removing Rogers as administrator.*

In her notice of appeal filed March 24, 2017, Rogers purported to appeal from the probate court's March 13, 2017 tentative decision granting petitions to remove her as administrator of the estate. Orders removing a personal representative and revoking the letters of administration issued to the personal representative are appealable. (Prob. Code, §§ 1300, subd. (g), 1303, subd. (a); *Estate of Reed* (2017) 16 Cal.App.5th 1122, 1125-1126; see Code Civ. Proc., § 904.1, subd. (a)(10) [appeal may be taken "[f]rom an order made appealable by the Probate Code"].) However, a tentative decision is not an appealable judgment or order. (*In re Marriage of Hafferkamp* (1998) 61 Cal.App.4th 789, 793-794; *Jordan v. Malone* (1992) 5 Cal.App.4th 18, 20-21; see Cal. Rules of Court, rule 3.1590(b) ["The tentative decision does not constitute a judgment and is not binding on the court."].)

After Rogers filed her notice of appeal, the probate court entered its April 6, 2017 formal order and judgment removing Rogers as personal representative. We therefore deem Rogers's premature notice of appeal to have been timely filed from the subsequent order and judgment. (Cal. Rules of Court, rule 8.104(d)(1).)

2. *2016 judgment denying Rogers's petition for instructions.*

In her opening brief, Rogers contends this appeal is also from the probate court's ruling on her June 29, 2015 petition for additional instructions. An order instructing or refusing to instruct a personal representative (§ 1300, subd. (c); see *Conservatorship of*

14

*Gregory D.* (2013) 214 Cal.App.4th 62, 66, fn. 2), and an order directing or refusing to direct the distribution of property (§ 1303, subd. (g); see *Estate of Kelly* (2009) 172 Cal.App.4th 1367, 1370, fn. 1), are also appealable.  The probate court filed a tentative decision on May 9, 2016, denying Rogers's petition.  Rogers filed a notice of appeal on May 23, 2016.  (Case No. E066100.)  But, this court dismissed Rogers's appeal on June 27, 2016, when she neglected to timely file a civil case management statement. (See Cal. Rules of Court, rule 8.100(g).)

On July 20, 2016, we granted Rogers's motion to reinstate the appeal.  In our order, we noted the probate court's May 9, 2016 tentative decision did not appear to be an appealable judgment or order, and we directed Rogers to either submit a copy of the judgment or appealable order, or to explain why the tentative decision was, in fact, appealable.[5]  Rogers submitted a letter in which she explained the probate court's tentative decision, by its terms, became the court's statement of decision when neither party timely objected that the court had failed to address controverted issues.  (See Cal. Rules of Court, rule 3.1590(c)(4).)  Because a statement of decision is usually not appealable (*Estate of Reed*, *supra*, 16 Cal.App.5th at p. 1126, quoting *Alan v. American Honda Motor Co.*, *Inc.* (2007) 40 Cal.4th 894, 901 [statement of decision generally not appealable, but appellate court may treat statement of decision as appealable if it constitutes trial court's final decision on the merits]), and Rogers failed to provide us

---

[5] In addition, we informed Rogers that her appeal would be dismissed if she did not timely cure any default in designating the record on appeal or timely cure any default in paying any required fees or deposits for preparation of the record.  (See Cal. Rules of Court, rules 8.100(b)(2), (d)(3), 8.130(b), (d)(3)(A).)

with a copy of an appealable order or judgment, we again dismissed the appeal on August 17, 2016.

On September 2, 2016, the probate court issued its judgment denying Rogers's petition for additional instructions. The remittitur issued on our dismissal of Rogers's appeal on October 19, 2016. Eight days later, Rogers moved to recall the remittitur. She attached to her motion a copy of the probate court's September 2, 2016 judgment. But, because we found no "good cause" to recall the remittitur (Cal. Rules of Court, rule 8.272(c)(2); see Eisenberg et al., Cal. Practice Guide: Civil Appeals and Writs (The Rutter Group 2018) ¶¶ 14:36 to 14:44, pp. 14-8 to 14-10 [addressing proper grounds for recalling remittitur]), we denied Rogers's motion on November 17, 2016.

This court's August 17, 2016 order dismissing Rogers's first appeal did not expressly say it was without prejudice, so by operation of law it was *with* prejudice. (Code Civ. Proc., § 913 ["The dismissal of an appeal shall be with prejudice to the right to file another appeal within the time permitted, unless the dismissal is expressly made without prejudice to another appeal."].) Because that dismissal with prejudice had the effect of affirming the September 2, 2016 judgment, denying her petition for additional instruction, Rogers is barred from challenging the September 2, 2016 judgment denying her petition for additional instructions in this or any other appeal. (*In re Jasmon O.* (1994) 8 Cal.4th 398, 413 ["Normally the involuntary dismissal of an appeal leaves the judgment intact."]; *Linn v. Weinraub* (1948) 85 Cal.App.2d 109, 110 ["As the effect of the order of dismissal herein was affirmance of the judgment, no second appeal from the same judgment can be maintained."].)

16

### 3. *2001 ruling on coadministrators' petition for instructions.*

Finally, much of Rogers's argument in her briefs is premised on her continued assertion that the August 30, 2001 ruling on the coadministrators' petition for instructions "was wrong." As noted, *ante*, an order instructing or declining to instruct an administrator, and an order directing or declining to direct the distribution of property is appealable. (§§ 1300, subd. (c), 1303, subd. (g).) But, at first blush, it would appear the time to appeal from the 2001 ruling passed more than 17 years ago. The time to appeal from a judgment or appealable order runs from service of a notice of entry by the clerk of the superior court or a party (60 days), or from entry of the judgment or order (180 days), whichever is sooner. (Cal. Rules of Court, rule 8.104(a)(1)(A)-(C); see *id*., rule 8.104(e) ["'judgment'" includes "appealable order"].) Relevant here, an appealable order's entry date is the date the order is entered in the permanent minutes. (*Id*., rule 8.104(c)(2).) "But if the minute order directs that a written order be prepared, the entry date is the date the signed order is filed . . . ." (*Ibid*.) A minute order that directs the preparation of a formal written order is not itself appealable. (*Herrscher v. Herrscher* (1953) 41 Cal.2d 300, 304-306; *Schneer v. Llaurado* (2015) 242 Cal.App.4th 1276, 1282.)

The minute order for August 30, 2001, indicates the probate court granted the coadministrators' petition for instructions and directed their attorney to prepare and submit a "[f]ormal order." But, as the probate court stated in its May 9, 2016 tentative decision denying Rogers's petition for additional instructions, "that never happened."

17

Strictly speaking, the August 30, 2001 ruling as reflected in the minute order was never "entered" and, therefore, was not immediately appealable.**6**

It is unclear from the record before us whether the 2001 ruling became appealable at some later point in the intervening 15 years or so, but we need not decide that issue. *At the very latest*, the August 30, 2001 ruling was subject to appellate review when the probate court entered a formal order and judgment on September 2, 2016, denying Rogers's petition for additional instructions. On appeal from an appealable judgment or order, "the reviewing court may review the verdict or decision and any intermediate ruling, proceeding, order or decision which involves the merits or necessarily affects the judgment or order appealed from or which substantially affects the rights of a party," except for "any decision or order from which an appeal might have been taken." (Code Civ. Proc., § 906.)

As already recounted, *ante*, Rogers *did* appeal from the denial of her petition for additional instructions, but we dismissed the appeal when she defaulted by failing to timely provide us with an appealable judgment or order. To repeat, the now-final dismissal had the effect of affirming the 2016 judgment denying Rogers's petition. (*In re Jasmon O.*, *supra*, 8 Cal.4th at p. 413; *Linn v. Weinraub*, *supra*, 85 Cal.App.2d at p. 110.)

---

**6** Arguably, the attorney's negligence in never submitting a formal order is attributable to Rogers. (See *Carroll v. Abbott Laboratories*, *Inc*. (1982) 32 Cal.3d 892, 897-898 [attorney negligence attributable to client unless attorney's conduct essentially obliterates attorney-client relationship].) We need not decide whether Rogers is estopped or otherwise barred by principles of equity from relying on her former attorney's negligence to essentially argue that the time to appeal from the August 30, 2001 ruling was extended indefinitely *because* her attorney never filed a formal order.

Therefore, not only is Rogers barred from relitigating the 2016 judgment in this or any other appeal, she is also barred from relitigating all prior nonappealable orders embraced within it, including the August 30, 2001 ruling instructing the coadministrators.

In sum, we conclude this appeal is limited to the probate court's April 6, 2017 order and judgment removing Rogers as personal representative.

B.      *The Probate Court Did Not Abuse Its Discretion When It Removed Rogers as Personal Representative.*

Rogers argues the probate court's findings of fact are not supported by the record and, therefore, the court abused its discretion by removing her.  We are not persuaded.

### 1.    *Applicable Law.*

"The probate court or judge is the guardian of estates of deceased persons and all proceedings are under the direction of the judge.  An executor or administrator derives his power to act from the order of the court." (*County of Los Angeles v. Morrison* (1940) 15 Cal.2d 368, 371.)  "[T]he executor or administrator occupies a fiduciary relationship in respect to all parties having an interest in the estate including heirs, beneficiaries under the will and creditors [citations] and, as a fiduciary, has the duty towards such parties to protect their legal rights in the estate." (*Nathanson v. Superior Court* (1974) 12 Cal.3d 355, 364-365.)  "The duties of 'an executor or administrator in handling an estate . . . are to preserve and protect the estate, to satisfy and discharge all debts and claims and to distribute the residue of the property to those entitled to receive it.'" (*Estate of Bonanno* (2008) 165 Cal.App.4th 7, 17-18, quoting *Estate of Denman* (1979) 94 Cal.App.3d 289, 292; see §§ 8404, 9600; Judicial Council Forms, form DE-147 [explaining the duties and liabilities of a personal representative].)

Any interested person may petition the probate court to remove the personal representative of an estate and appoint a successor representative.  (§ 8500, subd. (a).)  On receipt of the petition, the probate court must issue a citation to the personal representative to show cause why he or she should not be removed.  (*Id*., subd. (b).)  The court may also issue a citation on its own motion "if the court otherwise has reason to believe from the court's own knowledge or from other credible information . . . that there are grounds for removal . . . ." (*Ibid*.)  The question of whether to remove the personal

20

representative "shall be heard and determined by the court," and, "[if] the court is satisfied from the evidence that the citation has been duly served and cause for removal exists, the court shall remove the personal representative from office." (*Id*., subd. (d).) When the probate court removes a personal representative, it "shall revoke any letters issued to the personal representative, and the authority of the personal representative ceases." (§ 8501.)

"A personal representative may be removed from office for any of the following causes: [¶] (a) The personal representative has wasted, embezzled, mismanaged, or committed a fraud on the estate, or is about to do so. [¶] (b) The personal representative is incapable of properly executing the duties of the office or is otherwise not qualified for appointment as personal representative. [¶] (c) The personal representative has wrongfully neglected the estate, or has long neglected to perform any act as personal representative. [¶] (d) Removal is otherwise necessary for protection of the estate or interested persons. [¶] (e) Any other cause provided by statute." (§ 8502.)

The party seeking removal bears the burden of proving grounds for such. The personal representative, in turn, has "the right to rely on the presumption of fair conduct and faithful performance of official duty until something [is] offered to overcome it." (*Estate of Buchman* (1954) 123 Cal.App.2d 546, 554.) "While it is the clear duty of the court to remove an executor or administrator when his [or her] unfitness has been proved, it is at the same time the right of every trustee to receive full acquittance of charges impugning his [or her] integrity or competence which are not established by clear and satisfactory evidence." (*Estate of Wacholder* (1946) 76 Cal.App.2d 452, 464.)

21

## 2.    *Standard of Review.*

The probate court's decision removing or declining to remove a personal representative is reviewed for abuse of discretion.  (*Estate of Effron* (1981) 117 Cal.App.3d 915, 930; *Estate of Wemyss* (1975) 49 Cal.App.3d 53, 61; *Estate of Cole* (1966) 240 Cal.App.2d 324, 328-329.)  "'"To the probate court is given, in the first instance, the supervision and protection of estates of deceased persons, with power, in the exercise of that supervision, to remove an executor when, in its discretion, such step is necessary for the protection of the estate; and that power is not to be interfered with by the appellate court, unless there has been a clear abuse of that discretion."'"  (*Estate of Hammer* (1993) 19 Cal.App.4th 1621, 1633-1634 (*Hammer*), quoting *Luckey v. Superior Court* (1930) 209 Cal. 360, 370.)

The abuse of discretion standard applies "even [when] the evidence is of such a nature that reasonable minds would possibly differ regarding the facts." (*Estate of Wemyss*, *supra*, 49 Cal.App.3d at p. 61.)  "'The test is not whether we would have made a different decision had the matter been submitted to us in the first instance.  Rather, the discretion is that of the trial court, and we will only interfere with its ruling if we find that under all the evidence, viewed most favorably in support of the trial court's action, no judge reasonably could have reached the challenged result.'"  (*Hammer*, *supra*, 19 Cal.App.4th at p. 1634.)

As with all factual determinations, the probate court's findings of fact underlying its discretionary decision to remove an administrator are reviewed for substantial

22

evidence. On appeal, "[o]ur authority begins and ends with a determination of whether, on the entire record, there is *any* substantial evidence, contradicted or uncontradicted, which will support the judgment. [Citations.] Therefore, we must consider all of the evidence in the light most favorable to the prevailing party, giving that party the benefit of every reasonable inference from the evidence tending to establish the correctness of the trial court's decision, and resolving conflicts in support of the trial court's decision." (*Estate of Beard* (1999) 71 Cal.App.4th 753, 778.)

"It is well settled that all presumptions and intendments are in favor of supporting the judgment or order appealed from, and that the appellant has the burden of showing reversible error, and in the absence of such showing, the judgment or order appealed from will be affirmed." (*Estate of Armstrong* (1937) 8 Cal.2d 204, 209; accord, *Denham v. Superior Court* (1970) 2 Cal.3d 557, 564; *In re Marriage of Arceneaux* (1990) 51 Cal.3d 1130, 1133.) "If the *decision* of a lower court is correct on any theory of law applicable to the case, the judgment or order will be affirmed regardless of the correctness of the grounds upon which the lower court reached its conclusion." (*Estate of Beard*, *supra*, 71 Cal.App.4th at p. 776.)

        3.     *Analysis.*

        a.     Incapacity.

The probate court concluded Rogers was "'incapable of properly executing the duties of the office'" of administrator (§ 8502, subd. (b)) because from 2001 forward "she continu[ed] to resist implementation of the court's [2001] order," and she did not act as an impartial fiduciary. Rogers's failure to comply with probate court's 2001 instructions

and her bad faith conduct toward the heirs does not demonstrate incapacity for purposes of section 8502. But we conclude the evidence supports a finding that she was "otherwise not qualified for appointment as personal representative." (§ 8502, subd. (b).)

The probate court appears to have interpreted Probate Code section 8502, subdivision (b), to provide for removal of a personal representative who is simply unwilling to perform her duties or unwilling to comply with lawful orders of the probate court. But for our purposes, "incapable" is not a synonym for unwillingness. Rather, "incapable" refers to legal incapacity. For instance, for reasons of public policy, a minor is legally incapable of entering into a contract based solely on her minority, whether or not she is willing and able to perform. (Civ. Code, § 1556.) A person of "unsound mind" who is "entirely without understanding" is also legally incapable of entering into a contract. (Civ. Code, §§ 38, 1556; see Prob. Code, §§ 1872, subd. (a).) And, a person who lacks the ability to understand is legally incapable of expressing testamentary intent. (Prob. Code, § 6100.5, subd. (a)(1).)

Incapable has the same meaning when it comes to personal representatives. Inter alia, "a person is not competent to act as personal representative" and, therefore, shall not be appointed as such, if "[t]he person is under the age of majority" or "[t]he person is subject to a conservatorship of the estate or is otherwise incapable of executing, or is otherwise unfit to execute, the duties of office." (§ 8402, subd. (a)(1)-(2).) And if an administrator becomes incapable of performing her duties after she is appointed, she may be removed from her office. (§ 8502, subd. (b).)

24

In *Hammer*, the sole heir to an estate unsuccessfully petitioned the probate court to remove her estranged husband as executor.  (19 Cal.App.4th at pp. 1630-1631.)  On appeal, the heir argued, inter alia, the executor was incapable and should have been removed under section 8502, subdivision (b), because he did "not have the financial resources to properly perform his duties as executor and [was] 'unqualified by training or experience to manage a complicated lawsuit [on behalf of the estate].'"  (*Hammer*, at p. 1642.)

The appellate court concluded "there is insufficient evidence of incapacity . . . ." (*Hammer*, *supra*, 19 Cal.App.4th at p. 1642.)  "In a case interpreting the terms 'incapable' and 'incompetent' in predecessor statutes, the court stated:  'The legislature has classified death, insanity, and conviction of an infamous offense under the designation "incapable," and other matters affecting the integrity or qualification for the discharge of the duties of an administrator as "incompetency."  The embezzler, the thief, the man who hesitates at no fraudulent scheme to despoil an estate, or who is so careless and indifferent as to habitually and grossly neglect his duties may have capacity to properly discharge all the duties of an administrator, but the man who is dead, or insane, or *civiliter mortuus* is "incapable."  Whether the word "incompetent" was wisely chosen or not, the context leaves no room to doubt the sense in which it was used, and that it was used to designate a different class from those characterized as "incapable."'"  (*Hammer*, at pp. 1642-1643, quoting *In re Blinn* (1893) 99 Cal. 216, 221.)

However, the court concluded the evidence supported removal of the executor because he "was 'otherwise not qualified.'"  (*Hammer*, *supra*, 19 Cal.App.4th at p. 1642.)

25

"[T]here is evidence the executor was incompetent in the sense that he possessed a conflict of interest with the beneficiary, lacked trustworthiness or was engaged in a scheme to advance his own self-interests at the expense of the estate and its beneficiary." (*Id.* at p. 1643.) Among other things, the executor made threats to the sole beneficiary and was involved in litigation against her. (*Ibid.*) Therefore, the appellate court concluded the probate court abused its discretion by not removing the executor. (*Ibid.*)

As in *Hammer*, the record before this court does not show Rogers suffered from physical or mental incapacity. But, the evidence supports the conclusion she was "otherwise not qualified for appointment as personal representative." (§ 8502, subd. (b).) Armuress's expert witness testified Rogers did not effectively market the estate's land holdings in the years after the probate court's 2001 ruling. Rogers removed parcels from the active listings for periods of time and failed to adjust the asking price when the market for similar undeveloped land dropped considerably. At the time of trial, the properties were listed for a total asking price of more than $9 million, but the expert opined the property was worth no more than $6.1 million and the inflated asking price meant the property was effectively off the market. Rogers's expert provided contrary testimony, for sure, but the record supports the probate court's conclusion that "the weight of [the] evidence" showed the properties had been marketable since 2001 yet Rogers failed to sell them.

In addition, the record supports the probate court's conclusion that Rogers acted in bad faith and was not an impartial fiduciary. Armuress testified Rogers threatened to disinherit him and his father if they did not cooperate. Both Brian Lincoln and Jennifer

Sapp testified Rogers had offered to buy out the heirs for $10,000 each, although the estate property was worth millions of dollars. Rogers argues their testimony "was false and unproven." But, she introduced no contradictory evidence, and the probate court, as the trier of fact, was entitled to determine how much credence and weight the testimony deserved. "The trial court was the trier of fact and the sole judge of the credibility of witnesses. We are not in a position to weigh any conflicts or disputes in the evidence. Even if different inferences can reasonably be drawn from the evidence, we may not substitute our own inferences or deductions for those of the trial court." (*Estate of Beard*, *supra*, 71 Cal.App.4th at pp. 778-779.)

In sum, we conclude the record supports the probate court's factual findings that Rogers resisted implementing the 2001 instructions and acted in bad faith toward the heirs. And, we find Rogers was properly removed as administrator because she was "otherwise not qualified." (§ 8502, subd. (b).)

            b.      Mismanagement.

The probate court also found that, "based upon the 15 1/2 year delay" in winding up the estate, and "testimony which suggests that this administrator is asking the parties to wait some more while she pursues a novel theory," Rogers "mismanaged" the estate and should be removed. (§ 8502, subd. (a).) We agree.

There is scant authority on what constitutes mismanagement for purposes of removal under section 8502, subdivision (b). Seventy-four years ago, the Third Appellate District held "[m]ismanagement of an estate which may authorize the revocation of letters under [former] section 521 of the Probate Code [(the precursor to

§ 8502, subd. (a))] does not necessarily mean that the executor or administrator shall be guilty of fraud or of willful or deliberate acts detrimental to the estate. The term 'mismanage' has been construed to mean merely that the business of the estate has been badly, improperly or unskillfully conducted." (*Estate of Palm* (1945) 68 Cal.App.2d 204, 210, citing *McKnight v. U.S.* (9th Cir. 1935) 78 F.2d 931, 933; accord, *Succession of Houssiere* (1965) 247 La. 764, 772 [relying on *McKnight*'s definition of "mismanage" when interpreting Louisiana statute for removal of a "succession representative"]; cf. *Buss v. J. O. Martin Co.* (1966) 241 Cal.App.2d 123, 134 [relying on *Palm* and *McKnight* to interpret "mismanagement" for purposes of involuntary dissolution of a corporation under Corp. Code, former § 4651].)

In *Estate of Feeney* (1983) 139 Cal.App.3d 812, the probate court removed an executrix for mismanagement under former section 521 when she refused to sign petitions requesting the probate court vacate the sale of estate property to one buyer and approve a sale to another buyer. (*Estate of Feeney*, at pp. 816-817.) On appeal, the executrix argued the removal statute had to be read in conjunction with former section 758, which governed orders directing a personal representative to sell property and, at most, the probate court should have directed her to file the petitions. (*Estate of Feeney*, at p. 819.)

A panel of this court agreed with the executrix.  Citing an American Law Reports annotation, this court wrote that former section 521 was "clearly designed to deal with administrative malfeasance amounting to a moral wrong."**7**  (*Estate of Feeney*, *supra*, 139 Cal.App.3d at p. 821.)  We concluded the "[p]lacement of 'embezzle[ment]' and 'waste' alongside 'mismanagement' as causes for removal . . . underscores this point."  (*Ibid.*)  Moreover, we noted "[f]ailure to reserve removal for the most serious of malefactions would, in short, obliterate the distinction between [former] sections 521 and 758 . . . .  Not every error of judgment amounts to a violation of a fiduciary trust. . . .  'No man is infallible; the wisest makes mistakes; but the law holds no executor responsible for the consequences of his mistakes which are the result of imperfection of human judgment and do not proceed from fraud, gross carelessness, or indifference to duty.'"  (*Ibid.*)  Because the record did not show the executrix acted out of "bad faith or cupidity," this court concluded an order compelling the executrix to sell the property "would have adequately protected the interests of the estate," and we reversed the order removing her.  (*Ibid.*)

---

**7**  The annotation this court cited is rather dubious authority for the proposition that statutes for the removal of personal representatives in general, and former section 531 in particular, were designed solely to address administrative malfeasance.  At most, the annotation cites an 1892 intermediate appellate court decision from New York, which affirmed the denial of a request to remove an executor because "there had been no misconduct on the part of the executors, in the sense of any moral wrong, [so] there was no ground for their removal . . . ."  (Annot., Remedies in event of executor's or testamentary trustee's delay in exercise of power to sell real estate conferred by will (1941) 132 A.L.R. 1473, 1479, citing *Wilcox v. Quinby* (1892) 20 N.Y.S. 5, 5.)

Without expressly saying so, it appears this court in *Feeney* applied the doctrine of statutory interpretation *ejusdem generis* (also known as *noscitur a sociis*) when we interpreted "mismanagement" to be a moral wrong like the other bases for removal under former section 521, such as embezzlement. "[W]hen a statute contains a list or catalogue of items, a court should determine the meaning of each by reference to the others, giving preference to an interpretation that uniformly treats items similar in nature and scope. [Citations.] In accordance with this principle of construction, a court will adopt a restrictive meaning of a listed item if acceptance of a more expansive meaning would make other items in the list unnecessary or redundant, or would make the item markedly dissimilar to the other items in the list." (*Moore v. California State Bd. of Accountancy* (1992) 2 Cal.4th 999, 1011-1012.)

Although removal of a personal representative for embezzlement or fraud clearly requires an affirmative showing of moral wrongdoing, and we assume intentional wrongdoing by an administrator will normally establish mismanagement, we must disagree with *Feeney* that all bases for removal set forth in former section 521 or current section 8502, subdivision (a), of the Probate Code require a showing of intentional wrongdoing. For example, the same list that includes mismanagement, fraud and embezzlement as causes for removal also includes waste. (Prob. Code, § 8502, subd. (a); see *Estate of Foreman* (1969) 269 Cal.App.2d 180, 181-182, fn. 2, quoting Prob. Code, former § 521.) Waste is defined as injury to the value of an inheritance through an unlawful act *or* through a simple omission of duty; it does not necessarily require a showing of malfeasance or bad faith. (*Avalon Pacific—Santa Ana*, *L.P. v. HD Supply*

30

*Repair & Remodel*, *LLC* (2011) 192 Cal.App.4th 1183, 1211-1212; 12 Witkin, Summary

of Cal. Law (11th ed. 2017) Real Property, § 385, pp. 444-445; see Civ. Code, § 818.)

The fact that waste is not necessarily a "moral wrong" calls into serious question

our conclusion in *Feeney* that all four bases for removal under former section 521,

including mismanagement, must be interpreted to require an affirmative showing of

moral wrongdoing.[8]  Therefore, we overrule our decision in *Feeney* to the extent it held a

personal representative can only be removed for mismanagement upon a showing of

moral wrongdoing[9] and, instead, adopt the more commonsense definition of the term

"mismanagement" from *Estate of Palm*, *supra*, 68 Cal.App.2d at page 210.

---

[8]  Commonly used dictionaries support our conclusion that removal of a personal representative for "mismanagement" need not be limited to cases of moral wrongdoing. Webster's defines "mismanage" as "to manage wrongly *or* incompetently," and defines "mismanagement" as "corrupt *or* improper management."  (Webster's 3d New Internat. Dict. (1993) p. 1444, col. 2, italics added.)  And the Oxford English Dictionary defines "mismanagement" as "Bad or improper management or administration."  (See Oxford English Dictionary at <http://www.oed.com/view/Entry/119792?redirectedFrom =mismanagement#eid> [as of June 11, 2019].)

[9]  Absent a compelling reason, the Courts of Appeal are normally loath to overrule prior decisions from another panel of the same undivided district or from the same division.  (See, e.g., *Opsal v. United Services Auto Assn.* (1991) 2 Cal.App.4th 1197, 1204 ["[m]ere disagreement with the result or reasoning" of a decision by panel of same division is not a compelling reason to overrule a prior decision].)  But, because we conclude *Feeney* wrongly interpreted the term "mismanagement" for purposes of removing a personal representative of an estate, we find compelling reasons exist to overrule it.  (See *Saucedo v. Mercury Sav. & Loan Assn.* (1980) 111 Cal.App.3d 309, 310, 315 [in which this court concluded our prior decision in *Pas. v. Hill* (1978) 87 Cal.App.3d 521 was wrongly decided and overruled it].)  As far as we can tell, *Feeney*'s analysis of removal for mismanagement has never been cited by another California appellate court, so overruling that decision will not undermine the "orderly administration of justice."  (*Opsal*, at p. 1203.)

31

In any event, we conclude Rogers was properly removed under either definition of "mismanagement." The evidence in this case shows Rogers did not merely neglect to comply with the probate court's instructions or make an honest mistake in how she did so. Rather, the record shows she spent more than 15 years delaying the sale of the estate's property, all the while claiming the instructions were wrong and trying in bad faith to buy out the heirs for much less than they would be entitled from proceeds of a sale. The probate court acted within its discretion to conclude a speedy and final resolution of the estate required Rogers's removal and appointment of a new administrator.

## III.

## DISPOSITION

The judgment removing Edith Rogers as administrator and revoking the letters of administration issued to her is affirmed. Armuress Sapp will recover his costs on appeal.

CERTIFIED FOR PUBLICATION

McKINSTER
                                                                    J.

We concur:


RAMIREZ
              P. J.


CODRINGTON
              J.

32