Filed 12/16/25  In re S.S. CA2/4

# NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS

**California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.**

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SECOND APPELLATE DISTRICT

DIVISION FOUR

| | |
|---|---|
| In re S.S., et al., Persons Coming Under the Juvenile Court Law. | B344894 |
| LOS ANGELES COUNTY DEPARTMENT OF CHILDREN AND FAMILY SERVICES,<br><br>        Plaintiff and Respondent,<br><br>    v.<br><br>T.B.,<br><br>        Defendant and Appellant. | (Los Angeles County Super. Ct. No. 24LJJP00304A-B) |

APPEAL from order of the Superior Court of Los Angeles County, Stephanie M. Davis, Judge.  Affirmed.

Gina Zaragoza, under appointment by the Court of Appeal, for Defendant and Appellant.

Dawyn R. Harrison, County Counsel, Kim Nemoy, Assistant County Counsel, and Jessica S. Mitchell, Senior Deputy County Counsel, for Plaintiff and Respondent.

_____

Mother, T.B., appeals from the juvenile court's order terminating jurisdiction over her daughter, H.H., and granting H.H.'s father sole physical custody with monitored visitation for mother.  Mother contends the juvenile court abused its discretion by (1) terminating jurisdiction and (2) improperly delegating to H.H.'s father the authority to determine whether any in-person visits will occur.  We affirm the order.

## FACTUAL AND PROCEDURAL BACKGROUND
### A.    Referral, Petition, and Detention

Mother has two minor children, H.H. (age 8) and S.S. (age 15).[1]  H.H.'s father is F.H. (father).

In August 2024, the Los Angeles County Department of Children and Family Services (DCFS) received a referral alleging mother engaged in a physical altercation with S.S.  Mother, S.S., and H.H. were living at mother's boyfriend's home.  According to the reporting party, mother pushed, choked, tried to bite, and hit S.S. with a broomstick when he was attempting to leave to stay with his adult sister, T.S.  The reporting party also expressed

---

[1]    Mother filed a notice of appeal as to certain orders concerning S.S., but she did not address those orders in her opening brief, thereby forfeiting her appeal of them.  (*Swain v. LaserAway Medical Group, Inc.* (2020) 57 Cal.App.5th 59, 72.)  We focus on the facts relevant to H.H.

2

concern that mother was physically abusing H.H. Mother allegedly hit H.H. for stomping on a stairway. H.H. told S.S. it hurt, and S.S. reported seeing small welts on H.H.'s back and legs.

A social worker met with S.S. He said the altercation happened after mother got mad at him when he tried to talk to her about moving out of her boyfriend's house. S.S. gathered his belongings, but mother told him he could not leave. S.S. said mother got a broomstick and hit him with it. The broomstick broke, and H.H. was told to hit S.S. with it. Mother was pulling on his sweatshirt and scratching him, and he pushed her to defend himself. The social worker observed scratches on S.S.'s neck, chin, and cheek. The social worker also spoke with adult sister T.S. T.S. said that when she arrived, she saw S.S. running with his belongings and mother running with a broomstick. T.S. pulled out her cellphone to record mother, and mother walked away. T.S. then took S.S. to her home.

When the social worker spoke with mother, mother said she was "'the victim here, not [S.S.]'" Mother said that S.S. pushed and hit her. Mother also blamed adult sister T.S. for influencing S.S. DCFS obtained a report from the Sheriff's station relating to the incident. The records showed mother told the police that her "autistic son [S.S.] hit her multiple times." The response stated, "No visible injuries. No elder abuse." (Boldface omitted.)

The social worker met with S.S. again about a week later. He reiterated that mother pushed him, tried to bite him, hit him with a broomstick, and told H.H. to also hit him with a broomstick. S.S. added that during his Christmas break in 2023, mother pulled a knife on him and almost stabbed him.

3

In September 2024, the juvenile court authorized the children's removal from mother. Mother called the social worker and asked why the children were being removed. She said S.S. assaulted her and she was the victim. A few days later, DCFS filed a petition on behalf of the children under Welfare and Institutions Code[2] section 300, subdivisions (a), (b)(1), and (j). The petition alleged mother physically abused S.S., which placed H.H. at serious risk of harm.

## B. Further Investigation

Father contacted DCFS a few days before the initial hearing. Father told the social worker he learned from his stepchildren that H.H. was removed from mother, and he stated that information mother provided about him being an absent father was false. He explained that until mother moved in with her boyfriend, he communicated with mother about H.H. daily and visited her two to three times a month. Father said things changed after mother's boyfriend got involved. Mother changed her number, and father had not seen H.H. in about three months. He said he wanted H.H. in his care.

DCFS visited father's and his fiancé's home the next day. Inside one of the bedrooms was a twin size bed that belonged to H.H. Later the same day, the social worker visited H.H. When the social worker asked H.H. about father, she responded, "'That's not my dad. My dad is [mother's boyfriend]!'"

At the initial hearing, the juvenile court noted H.H. indicated she did not know or have a relationship with father. The court found a prima facie case the children were persons

---

[2] All further statutory references are to the Welfare and Institutions Code.

described by section 300 and ordered H.H. detained from mother and father.

The juvenile court held a prerelease investigation hearing two weeks later. H.H. and S.S. were placed with adult sister T.S., and mother was permitted to live in the home. The court noted it had a "major concern" that mother was coaching the children.

H.H. had a forensic interview in October 2024. When asked what father was like, H.H. responded, "I forgot." She said the last time she saw him was a couple of years ago. She said that mother did not have father's phone number because her "stepdad doesn't allow her." When asked if there was something that she did not like about father, H.H. answered, "Nothing."

In late October 2024, the social worker observed a visit between father and H.H. at a park. H.H. called father "'dad,'" and they played together. At the end of the visit, H.H. appeared sad and said she wanted to go with father. Father told the social worker he used to visit H.H. every other weekend consistently until mother's boyfriend interfered. Father texted the social worker pictures of himself with H.H. throughout the years and text messages between him and mother proving he had been involved with H.H. He said that mother told H.H. to say that she did not know father in court.

The social worker spoke with H.H. about a visit she had with father in late November 2024. H.H. reported she had a lot of fun and that no one made her feel sad. She said she did not feel scared and felt safe.

DCFS held a child and family team meeting with mother. Mother did not acknowledge there was a problem, denied the incident with S.S. occurred, and blamed S.S. for everything.

Mother also minimized father's involvement with H.H., stating that he had not seen H.H. since she was one year old. DCFS recommended that H.H. be released to father and remain detained from mother.

On Christmas Eve 2024, mother called the social worker and said H.H. wanted to talk to the social worker. Mother claimed she did not know about what. H.H. told the social worker that father smokes during visits and "does not say nice things" about mother. H.H. said she did not want to spend the night at father's home.

A few days later, adult sister T.S. called the social worker and reported that H.H. said father did not pay attention to her. T.S. said H.H. told her that another child broke a television in father's home and they all got hit. T.S. also said father did not have a car seat when he picked up H.H. Father denied smoking in the home or physically disciplining his children. When the social worker previously told father it had been reported he did not have a car seat for H.H., he denied the allegation and said he used a car seat.

Shortly thereafter, adult sister T.S. called the social worker, discussed recent issues she had with mother, and said that mother was coaching H.H. DCFS arranged for H.H. to go on an extended visit with father.

In mid-January 2025, the social worker visited H.H. at father's home. Father said he saw text messages between mother and H.H. in which mother was coaching H.H. on what to say. Father said he also found deleted messages that mother encouraged H.H. to delete and that mother was tracking H.H.'s location after every phone call, which made H.H. upset. At a

hearing a few days later, the juvenile court released H.H. to father with monitored visits for mother.

In a March 2025 addendum report, DCFS stated H.H. was living with father. DCFS stated father was consistent with H.H.'s needs and was able to create long-term safety in the household. DCFS recommended the juvenile court terminate jurisdiction and issue a custody order granting the parents joint legal custody with full physical custody to father and monitored visitation for mother.

## C. Jurisdiction and Disposition Hearing

On March 11, 2025, the juvenile court held the jurisdiction and disposition hearing. The court sustained the section 300 petition as amended by interlineation. The court found that H.H. had been coached, and it found the children's statements immediately after the incident credible.

The juvenile court moved directly to disposition. The court read H.H.'s stipulated testimony that, if called as a witness, H.H. would state her first choice would be to live with mother because she missed mother and their dog. H.H.'s second choice was to live with father because it made her "feel good," she felt safe at father's house, she had never been hurt there, and she had never gotten into any fights with father or anyone else at his home. H.H.'s third choice was to live with adult sister T.S. If not allowed to live with mother, H.H. said she would like to see her every day. H.H. said she would be sad if the case closed because she wanted to be with mother but would also feel safe. She also said she would feel good because she would not have to talk to social workers anymore.

The juvenile court noted that while mother had completed some programs, "her actions and words" suggested she still lacked insight into the situation. The court found there was a substantial danger to H.H.'s physical health, safety, protection, and emotional well-being and no reasonable means to protect H.H. without removal from mother. Further, the court noted mother's claim that father was not a part of H.H.'s life was untrue, and it concluded that living with father presented no safety issues for H.H.

The juvenile court terminated jurisdiction but stayed termination pending receipt of a juvenile custody order granting the parents joint legal custody and sole physical custody to father with monitored visits for mother. The court stated mother's visits were to be "a minimum of nine hours with a combination of in-person and video or telephone visits." The court ordered, "The exchange of the child is to occur in a neutral location, halfway between the parents' residence. [¶] And the parents are to use Talking Parent or some similar application to communicate and confirm meeting dates, times, and locations, advise of possible delays occurring due to traffic or cancellations." Visits were not to be monitored by adult sister T.S. or mother's boyfriend, but by an agreed-upon person or professional monitor paid for by mother. The court then discussed the language that was to be included in the custody order with the parties.

Three days later, the juvenile court signed and filed the custody order. The order granted father sole physical custody and the parents joint legal custody. It stated: "Mother to have monitored visits for a minimum of 9 hours per week. Agreed upon monitor or professional paid for by the mother. Exchanges at neutral location, half way between the parents['] residence.

8

[P]arents to use [T]alking [P]arents.  The following individuals—
T[.]S[.] . . . and [mother's boyfriend]—shall not be present during
the mother's visits."  The court lifted the stay and terminated
jurisdiction over H.H.  Mother timely appealed.

## DISCUSSION

### A.    The Juvenile Court Did Not Abuse Its Discretion by Terminating Jurisdiction Over H.H.

Mother argues termination of jurisdiction was not in H.H.'s
best interest and was an abuse of discretion.  We are not
persuaded.

"Section 361.2, subdivision (a) requires a court ordering
removal of a child first to determine whether there is a
noncustodial parent who wants to assume custody.  The court
shall place the child with that parent, unless that placement
would be detrimental to the child's safety, protection, or physical
or emotional well-being."  (*In re A.C.* (2020) 54 Cal.App.5th 38,
42.)  If the juvenile court places the child with the noncustodial
parent, it may terminate jurisdiction and order that parent
assume custody of the child, or order custody to that parent
subject to continued juvenile court supervision.  (§ 361.2,
subd. (b).)

"When deciding whether to terminate jurisdiction, the court
must determine whether there is a need for continued
supervision, not whether the conditions that justified taking
jurisdiction in the first place still exist . . . ."  (*In re Janee W.*
(2006) 140 Cal.App.4th 1444, 1451.)  "The question is whether
juvenile court services and ongoing supervision were necessary to
protect the child from harm."  (*In re D.B.* (2020) 48 Cal.App.5th
613, 624.)  We review a juvenile court's decision to terminate

9

jurisdiction for abuse of discretion and may not disturb such a ruling unless the court made an arbitrary, capricious, or patently absurd determination. (*In re C.W.* (2019) 33 Cal.App.5th 835, 863.) We will find an abuse of discretion only when we find that under all the evidence, viewed most favorably in support of the decision, no judge reasonably could have made the challenged decision. (*Estate of Sapp* (2019) 36 Cal.App.5th 86, 104.)

In this case, the juvenile court did not abuse its discretion in terminating jurisdiction over H.H. Father was nonoffending and was ready and willing to care for H.H. since becoming aware of the dependency proceedings. H.H. was comfortable with father, and she said she felt safe at his home. DCFS reported that father was consistent with H.H.'s needs and able to create long-term safety. DCFS did not identify any safety concerns regarding father or his care of H.H. that required the juvenile court's ongoing supervision. Mother acknowledges that the juvenile court found services were not necessary to maintain H.H.'s safety in father's home. Thus, the juvenile court's finding was supported by substantial evidence.

Mother contends there was evidence to dispute the juvenile court's finding, such as reports that father drove H.H. without a car seat and that the children in father's home were hit after a television was broken. Mother also argues continued supervision would have been in H.H.'s best interest because mother had been a custodial parent since H.H.'s birth, she had a strong bond with H.H., and H.H. said she wanted to live with mother. Even if the evidence cited by mother supported contrary findings, this would not establish that terminating jurisdiction was an abuse of discretion. (*In re Stephanie M.* (1994) 7 Cal.4th 295, 318–319 ["""When two or more inferences can reasonably be deduced from

10

the facts, the reviewing court has no authority to substitute its decision for that of the trial court"'"'"].) Moreover, mother ignores evidence showing that, at the time of the disposition hearing, mother still lacked insight into the issues that led to dependency. Additionally, the juvenile court found mother lied about father's involvement with H.H., and there was evidence that mother coached H.H. as to what to tell the court and social worker.

Mother further asserts that maintaining jurisdiction to ensure that she and H.H. continued to receive services and have visits would have been in H.H.'s best interest. However, the juvenile court was not required to maintain jurisdiction to allow mother to receive reunification services. (See *In re J.S.* (2011) 196 Cal.App.4th 1069, 1082 [once child was placed with noncustodial, nonoffending parent and "was found not to be 'at risk' in that setting for any of the enumerated harms, the core predicate for juvenile court jurisdiction disappeared"]; see also *In re Pedro Z.* (2010) 190 Cal.App.4th 12, 20 [if child is already placed in a parent's custody, juvenile court "is not concerned with reunification"].) Furthermore, mother was enrolled in services at the time of the disposition hearing, but the court found she had not made substantial progress in her programs. As to H.H., she could continue participating in services with father. Lastly, visits were ordered for mother, and mother could seek enforcement of the order in family court if necessary. (*In re T.H.* (2010) 190 Cal.App.4th 1119, 1123.)

Mother fails to demonstrate the juvenile court abused its discretion. The court reasonably determined that its supervision was no longer necessary.

11

**B.     The Juvenile Court Did Not Improperly Delegate Visitation Authority to Father**

Mother argues the juvenile court improperly delegated to father the ability to decide whether any in-person visits will occur.  We disagree.

When a juvenile court terminates dependency jurisdiction, it may issue a custody and visitation order.  (§ 362.4, subd. (a).)  "'The power to determine the right and extent of visitation by a noncustodial parent in a dependency case resides with the court and may not be delegated to nonjudicial officials or private parties.  [Citation.]  This rule of nondelegation applies to exit orders issued when dependency jurisdiction is terminated.'"  (*In re A.C.* (2011) 197 Cal.App.4th 796, 799.)  Although "[a] visitation order may delegate to a third party the responsibility for managing the details of visits, including their time, place and manner[,]" it may not "delegate discretion to determine whether visitation will occur . . . ."  (*In re T.H.*, *supra*, 190 Cal.App.4th at p. 1123.)  We review an order setting visitation for abuse of discretion.  (*In re J.M.* (2023) 89 Cal.App.5th 95, 113; *In re R.R.* (2010) 187 Cal.App.4th 1264, 1284.)

Mother contends that, while the custody order signed and filed by the juvenile court specifies that she is to have visits for a minimum of nine hours per week with exchanges to occur at a neutral location halfway between the parties' residences, the court stated at the March 11, 2025, disposition hearing that mother's visits were to include in-person and video or telephone visits.  Mother contends that if the court's March 11 oral order is followed, it results in an improper delegation to father to decide whether any in-person visits occur.

12

As an initial matter, mother did not object or suggest any modifications to the juvenile court's visitation order at the disposition hearing.  Nor did she raise the visitation issue she now raises.  Therefore, she forfeited her claim.  (*In re T.G.* (2015) 242 Cal.App.4th 976, 984; *Kevin R. v. Superior Court* (2010) 191 Cal.App.4th 676, 686.)

In any event, we do not find the juvenile court improperly delegated visitation authority to father.  Mother asserts the custody order in this case is similar to the improper visitation order in *In re T.H.*, *supra*, 190 Cal.App.4th 1119; however, that case is distinguishable.  In *In re T.H.*, the juvenile court's exit order provided supervised visitation for the noncustodial parent "only upon the 'agreement of the parents[,]'" "effectively delegat[ing] to [the custodial parent] the power to determine whether visitation w[ould] occur at all."  (*Id.* at p. 1123.)  The custodial parent objected to the noncustodial parent having any visitation at all, and the custodial parent "could conceivably agree to only one visit a year or less without violating the letter of the court's order."  (*Ibid.*)  The juvenile court abused its discretion "by framing its order in a way that gave [the custodial parent] an effective veto power over" the noncustodial parent's visitation rights.  (*Id.* at p. 1124.)

Unlike in *In re T.H.*, the juvenile court's visitation order in this case establishes a minimum amount of weekly visitation for mother.  At the disposition hearing, the court stated mother was to have monitored visits for a minimum of nine hours per week, including in-person visits.  The written custody order, signed and filed three days after the disposition hearing, confirms mother's visitation includes in-person visits.  It requires exchanges for visits to occur at a neutral location halfway between the parents'

13

residences. Consequently, both the court's oral and written orders require father to make H.H. available for in-person visits. If father violates the order, mother would be free to seek enforcement or modification of the order in a family court. (*In re T.H.*, *supra*, 190 Cal.App.4th at p. 1123.)

## DISPOSITION

The juvenile court's order is affirmed.

**NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS**

MORI, J.

We concur:

ZUKIN, P. J.

TAMZARIAN, J.