Filed 10/28/25; Certified for Publication 11/21/25 (order attached)

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

FIRST APPELLATE DISTRICT

DIVISION FOUR

| | |
|---|---|
| Estate of DANIEL W. BODMANN, Sr., Deceased. | |
| THOMAS E. KROUSE, JR., <br><br>     Petitioner and Appellant, <br><br> v. <br><br> HEATHER HOLDEN-BODMANN, <br><br>     Objector and Respondent. | A164552, A164876 <br><br> (San Mateo County <br> Super. Ct. Nos. 17-PRO-00952, <br> 00952(C), 00080) |
| HEATHER HOLDEN-BODMANN, <br><br>     Petitioner and Respondent, <br><br> v. <br><br> THOMAS E. KROUSE, JR., <br><br>     Objector and Appellant. | |

Thomas E. Krouse, Jr. (Tom[1]), a stepson of decedent Daniel W. Bodmann, Sr. (Dan), appeals from an order limiting his participation in Bodmann Insurance (an asset of Dan's estate) and disqualifying him to act as an executor of the estate pursuant to Probate Code[2] sections 8402, subdivision (a)(3), and 8502, subdivision (a), due to his mismanagement of the estate. Tom argues that the conduct in which he was found to have engaged could not amount to having mismanaged the estate, and that the trial court therefore abused its discretion in disqualifying him to act as an executor. We affirm.

---

[1] Because of their shared last names, we refer to the parties, without intending any disrespect, by their first names.

[2] All undesignated statutory references are to the Probate Code.

## FACTUAL AND PROCEDURAL HISTORY

This almost-decade-long probate dispute centers around the conflict between Dan's widow, Heather Holden-Bodmann, and six of his seven biological and stepchildren—including Tom—over the administration of Bodmann Insurance and the appointment of an executor for Dan's estate.

At the time of his death, Dan had seven biological and stepchildren. Six were from his first marriage, to a woman whose two sons—Eric and Tom Krouse—became Dan's stepsons. The two stepsons moved to Dan's home in Half Moon Bay, where Dan and their mother had four more children: Dan, Jr., Amy, Andrea, and Beth. The six children bonded as siblings and, in the disputes following Dan's death, have acted as a bloc. In 1988, Dan married Heather, whose daughter Eireann Flannery became his seventh (step)child. In the disputes following his death, Eireann has aligned with Heather.

As set forth in more detail below, Tom's dispute with Heather involved her control of the records of Bodmann Insurance, a business she had helped Dan run for almost 30 years. Dan's will directed Andrea to maintain the business, and she asked Tom to arrange a transfer of its clients to her. For reasons the parties hotly dispute, Heather did not promptly comply with Tom's demands to turn over records to facilitate a transfer. The court found that, during a heated confrontation between the two, Tom berated and bullied Heather, then sent her peremptory emails purporting to dictate her role in the business she and Dan had run for decades. Cooperation regarding the business collapsed, and dueling petitions to serve as executor ensued— one filed by Heather, and one filed jointly by Tom and Dan, Jr. Ultimately the court found Tom disqualified.

## 1. Structure and History of the Business

Heather and Dan were married nearly 30 years, until Dan died in 2016. For almost all that time, they ran Bodmann Insurance, selling life and health insurance out of Dan's house in Half Moon Bay. Dan was a licensed insurance agent. Heather, who was not, helped him by fielding calls and helping clients with questions or claim disputes in ways not requiring a license. She also assisted by navigating insurance carrier phone trees, going with Dan to professional conferences, and maintaining client relationships.

The business was intertwined with Dan and Heather's social life, with many clients being friends, neighbors, or fellow Rotary Club members. Dan and Heather met with clients in the kitchen, which Tom saw as "an essential part of the brand of Bodmann Insurance [as] your . . . neighborhood, trustworthy, independent, reliable . . . insurance agent, [with] Dan a member of the community, a former president of the rotary." Dan never gave the business an explicit legal form; his will disposes of it in terms implying he saw it as his sole proprietorship.[3]

Andrea got involved in the business in 2012, at which time she had a child and was in a relationship that Dan, then 72, found problematic. He proposed she move home, get an insurance license, and learn the business so that she could eventually take it over. Andrea did so, focusing on individual clients.

Tom, who lives near San Diego, never worked for Bodmann Insurance, but helped informally at times when visiting home. He has many business credentials—he is an MBA holder, a chartered financial analyst, and a CPA for purposes of business valuation—and he referred several companies for

---

[3] Heather has contended that the business was an implied partnership and/or community property. We express no view on those issues.

3

which he worked to Bodmann Insurance as clients, and thus worked with Dan as a client representative.

## 2. Dan's Decline, Estate Planning, and Death

Around 2004, Dan was diagnosed with cancer, for which he underwent years of debilitating treatment. In 2015, he had a spinal hematoma, which required surgery followed for some time by continuous 24-hour-a-day care. He recovered in part, but, in summer 2016, had a stroke that gravely impaired his speech and motor control.

In 2014, before his final decline, Dan executed a holographic will, without telling anyone, and put it in his desk. (No one disputes the will's authenticity; it has been admitted to probate.) The will creates a trust to benefit all seven biological and stepchildren and names each of them to serve as the executors of the estate. As for the business, the will states the trust is to receive all commissions and "pay [Andrea] $2000 to maintain clients of Bodmann Ins." The trust is to hold all funds and the house until Heather dies, at which time, if she has willed her estate to the trust or to charity, all seven children will divide the trust; if she has willed her estate to Eireann, the other six will divide the trust. The will gives the trust two goals: to "serve as f[i]duciary if necessary for the life of [Heather]" and to make Dan's and her combined estates "available in equal portion to the Seven Trustees." An addendum transfers "[o]wnership of my home" to the trust but affords Heather "full use until her death."

Attorney Ed Daniels testified that in April 2015—before the hematoma or stroke—he met at Dan's request with him and Heather to make an estate plan. They wanted a trust to provide for the surviving spouse for life and split the residue among the children. Daniels sent a draft, which among other things entitled Andrea to buy the business after Dan died. Daniels

4

brought a draft to the home in Dan's final weeks, but found Dan incompetent to sign it.

Dan died on September 12, 2016.

### 3.  Developments After Dan's Death

*The 11 Weeks Preceding Thanksgiving 2016*

In September 2016—before Dan's will was found—Ed Daniels wrote the (step)children to propose an agreement with Heather.  He informed them that he had been "putting an estate plan together" at Heather and Dan's request, but Dan's health had failed "before they could agree on all the details."  There was "no question as to the more important features of the plan," he stated, and Heather wished to implement it "in a way that would allay any concerns" about "the eventual disposition of [Dan's] estate."  Opining that Dan and Heather's assets would all "likely . . . be considered community property," Daniels asked all seven children to agree that Heather could (1) file a spousal property petition to administer the estate as community property, and (2) execute an irrevocable trust "providing for a seven-way division" upon her death.  Dan, Jr. and Tom saw this as a request to "sign over everything to Heather."

Soon after Daniels's letter, Beth found Dan's will, and Amy and Andrea retained an attorney to lodge the will in court.

At the time, Andrea was deeply bereaved and had trouble functioning. The will's direction to maintain the business made her feel nervous and intimidated about handling group clients and running a business, but she felt a duty to try her best to fulfill Dan's request.  She therefore accepted with great relief Tom's offer to arrange a transfer of broker-of-record status and relied very heavily if not entirely on him to communicate with Heather and handle the process.

5

When Dan died, Tom was finishing an unsuccessful campaign for the Assembly. After the election, "knowing that Andrea was supposed to be running the business," he contacted insurance carriers to learn how to transfer broker-of-record status, and made "trips up to the house to try to get [his] arms around what needed to be done to . . . secure the business." He tried on one visit to work with Heather to get information, but she "couldn't remember [a] password, or . . . didn't want to help and just wasn't saying it, or . . . was stunned."

At some point before Thanksgiving week (November 21–27, 2016), Heather spoke with Ron Collins, an insurance agent and longtime friend of Dan's. Collins had previously bought books of business from retiring agents or widows of deceased ones. Heather told him of Andrea's interest in buying the business, and they discussed how to value and structure the sale of an agency.

On hearing of the conversation, Tom thought Heather might have tried to sell Collins the business. Tom asked her to set up a meeting with Collins so they could "update him [and seek his advice] about the fact that [they had] found the will, and Andrea is supposed to take over the business," or, "if he's interested in the business, he can make an offer."

### Thanksgiving Week 2016

On Monday, November 21, Tom and Ed Daniels each sent emails that set in motion events leading to open conflict over the business.

Daniels's email renewed his proposal to the (step)children to agree that Heather could administer the estate as community property, to avoid probate costs, while executing a trust to divide any assets left after her death. He deemed the will "not inconsistent with . . . the draft trust."

Dan, Jr. was skeptical of the idea that he and his siblings "should still . . . sign over everything to Heather because . . . [the will] doesn't change

6

anything." His "visceral reaction" was that someone "was trying to take advantage" of them. Tom found the letter "dismissive and inappropriate"; his siblings, he testified, "all . . . reported the same [reaction]."

The other email on Monday November 21, was from Tom to Heather. It said that he would drive to Half Moon Bay the next day; accepted her offer to arrange a meeting with Collins on Friday; and said he hoped to "start looking at the Bodmann Insurance client and contract information and related files." Tom felt an urgency to transfer the broker-of-record status because he had heard of a deadline of 90 days after Dan's death (i.e., December 11) to transfer Anthem Blue Cross clients to Andrea "before Anthem recaptured all the clients and the commission flow." He believed Anthem generated the largest part of the business's revenue stream. He also feared that other carriers might have deadlines of which "[they] weren't aware." Tom had tried to learn about the transfer process from the carriers, but after he told them that he was not a Bodmann Insurance employee, they were reluctant to advise him.

### Tom's Confrontation with Heather

Tom met with Heather at the Half Moon Bay house and began asking for records. He spoke with Heather on Wednesday, and that night, she sent two emails about the conversation. One—to Andrea, cc'ing Tom—said, "Andrea, [Tom] told me this afternoon that both of you are interested in writing the next chapter of Bodmann Insurance. Sounds terrific! I've just sent you an inquiry from [client], & I'll send you anything else that comes in." Heather testified that she sent the email because she felt "a little trepidation about where was Andrea in this picture." Her other email, to Tom, said, "we discussed these items this afternoon. [¶] 1. Andrea & [Tom] are going to continue to operate Bodmann Insurance. [¶] 2. Heather will email any

7

insurance biz[–]related inquiries to Andrea. [¶] 3. We'll need to inventory our groups, verify their renewal periods. [¶] 4. We're going to meet w/ Ron Collins Fri . . . to gather information re: business arrangements. [¶] We covered other topics as well, but these seem . . . first of the next steps."

At trial, Tom gave this account of the conversation: "[After] a few days, it was clear that I was being led around in circles by the nose and had to sit down with [Heather] and establish whether we were cooperating or not and what her intentions [were]. [¶] So we met in the kitchen . . . and I tried to lay out . . . [the] background of Andrea giving up a lot [to work in the business], . . . trying to appeal to her to cooperate with us, knowing that this is a very personal business. [¶] . . . [I]t's a personal relationship between Dan and the clients, and to some extent, between Heather and the clients and the small community. [¶] I felt it critically advisable to work with Heather to the extent possible to effect the transition to Andrea with the requirement that there is a transition to Andrea, and that . . . Heather cooperate voluntarily, but at a minimum, not disrupt."

On Friday, November 25, Tom spoke with Collins and Heather about how to value and sell a book of business. Collins saw Heather as (1) happy to sell the business to Andrea if she wanted it, but worried that she was not committed to taking it over, and (2) uncomfortable with Tom's role because he lived far away, was not licensed, and did not know the insurance business. At trial, Tom recalled Collins telling Heather, "All the clients know who you are," and her replying, "Yes, I talk to them all the time." For Tom, this confirmed that "it's important to maintain continuity," and it would "add value to the company if she was cooperating during the transfer."

After the meeting, Tom tried to review records but grew frustrated at Heather's lack of cooperation. She or Eireann, he found, had locked the file

cabinets. On Sunday, November 27, he emailed Heather to ask if she had time to help "inventory[] all the clients" before he left the next day. That night, the tension came to a head in a heated, hours-long confrontation.

At trial, when asked what Tom requested in "that exchange," Heather replied, "it wasn't much of an exchange. Tom was making a lot of demands of things he wanted, things he required, things he needed, things I was not to do, files, computer information. [¶] I was really buffaloed by the whole scene. I just couldn't even begin to imagine what was behind this." Heather, who felt bereaved and "ragged," was hesitant to give Tom access to the files, which contain clients' "private information," implicating "personal loyalty to the clients as well as HIPAA.[4]" Tom "seemed very angry that I wasn't doing what he told me to do, and I saw absolutely no reason that he would tell me to do anything. I was really buffaloed by the whole thing. [¶] . . . I didn't know what he was up to really. I knew specifically . . . that he wanted forms, and he wanted files, and he wanted client information, and he wanted my desk and everything in it, and he wanted . . . all of it. He wanted everything right then and there. . . . [¶] [He] was . . . walking around the rooms and [waving] his arms and . . . getting at me. [¶] . . . I didn't feel physically afraid like he was going to shoot me or anything, but I felt certainly bullied, and I didn't know what was coming next . . . . [¶] And the more I backed off, the more angry he seemed to get. Obviously, I don't know his state of mind, but [from] his actions and words, . . . [I could] judge he was very angry, and I didn't know what he was going to do next."[5]

---

[4] The Health Insurance Portability and Accountability Act of 1996 (Pub.L. No. 104-191 (Aug. 21, 1996) 110 Stat. 1936).

[5] Eireann's testimony corroborated Heather's. She recalled Tom demanding "full access to . . . all of [Heather] and Dan's personal records, as

On Monday, November 28, after he left, Tom sent Heather two emails. One, titled, "Bodmann Insurance email policy" read, "Heather, [¶] Please be advised immediately that you are not to send outbound emails via the Dan@ BodmannInsurance.com email account. By doing so, you run an increased risk of violating California Insurance Code regulations[,] putting yourself and Bodmann Insurance at risk. [¶] Starting immediately, the email policy for your continued involvement at Bodmann Insurance, if any, requires that you cc all outbound emails to [email addresses for Andrea and Tom]. [¶] You also must forward all emails that you receive at Heather@BodmannInsurance.com to the . . . addresses above as soon as practically possible after they arrive. [¶] You are not to conduct any business activity related to Bodmann Insurance from any email account other than Heather@BodmannInsurance.com, and if you receive any Bodmann Insurance[–]related emails at any other email account, you must forward them immediately to the three emails listed

---

well as all [business] records, including client files," and Heather being uncomfortable based on her own privacy and that of her clients, as protected by HIPAA. Tom repeatedly moved toward Heather, gesticulating broadly, as she moved back, crying and trying to keep space between them. In what Eireann called an "explosion of abuse," Tom yelled at Heather "that she was a liar and . . . a thief" who had "mismanaged" the business and "was opening [it] and herself to liability"; that "her actions were going to ruin the business and . . . the estate," and that "he would make sure that she paid for her actions." Eventually, Heather "just gave up" and gave Tom access to the files.

For his part, Tom testified that Heather and Eireann's accounts were "histrionics" and "intentional exaggeration"; that any "raised voices" were mutual; and that he did not threaten or bully Heather. He instead tried to "educate her as to the reality we existed in" by explaining that if she "insisted on obstructing the business, at some point someone is going to ask why was she damaging the business and how much damage was done, and we're all potentially liable if something falls through the cracks," like a "policy lapses, and somebody dies, and they don't get a death benefit," so "they're suing us or Andrea." He also noted that he had to leave the next day and felt under a deadline (as to Anthem).

10

above. [¶] Please confirm you[r] receipt and understanding of this policy. [¶] Thank you, [¶] ~ Thomas."

The second email, titled, "Your singular priority for tomorrow," read, "Heather, [¶] You[r] singular priority for tomorrow is to attempt again to enable online access to Dan's group clients via the Anthem broker portal/dashboard. [¶] Please be sure to document each phone number you call, the name of each person you speak with, and the substance of what they and you discuss. [¶] Please notify Andrea and I immediately if & when you are able to restore access. If you are unable to restore access, please email Andrea and I your notes as requested above by the end of the business day tomorrow. [¶] Thank you, [¶] ~ Thomas."

### *The Breakdown in Cooperation and Decline of the Business*

Heather signed a letter to Anthem in December 2016 to authorize a transfer of the remaining Anthem clients from Dan to Andrea. Aside from this, however, effective cooperation largely ceased.

At trial, Andrea, Dan, Jr., and Tom described a perceived pattern in which Heather would communicate directly or via counsel that she would take steps to facilitate transfers of other clients, or convey records or business assets, yet not do so. Heather and Eireann, in turn, perceived Tom and others as pressuring Heather to sign documents or take steps that it was not clear she could lawfully take—or clear she could *not* take—given her duties to clients under HIPAA and her status as neither the broker of record nor a licensed agent.

In late 2016 and early 2017, Eireann and Tom separately contacted insurance companies, reviewed Bodmann Insurance's contracts with them, and researched laws to try to determine how to transfer clients properly to Andrea. Their findings and conclusions conflicted. Eireann and Heather compiled a list of Bodmann Insurance clients, which they conveyed to Tom on

11

behalf of Andrea. Tom and Andrea insisted the list was significantly incomplete; Eireann disagreed.

It was undisputed that, by the time of trial in 2019, the business had greatly shrunk from its size before Dan's decline. Tom and Andrea estimated without contradiction that it had once generated just over $100,000 in annual revenue but made only about $25,000 at the time of trial. Witnesses identified various non–mutually exclusive reasons for the decline, including clients having left while Dan's illness kept him and Heather from attending to their needs; clients having been transferred automatically to an insurance carrier upon Dan's death; or clients having left since then—either because Andrea did not reply to inquiries or because a lack of records kept her and Tom from contacting them.

### 4. The Litigation

In fall 2017, after months of stalemate, several family members filed probate petitions. Tom and Dan, Jr. jointly petitioned the court to admit the will to probate and appoint them executors. Heather objected to appointing Tom. Andrea and Tom sought letters of special administration.[6] Eireann nominated Heather to be executor, and she filed a petition, to which Tom and Dan, Jr. objected. Eric, Andrea, and Amy each renounced their respective nominations as executor, expressed support for Tom and Dan, Jr.'s petition, and opposed Heather's. (Beth evidently did not file a petition or renunciation.)

---

[6] Tom did not include in the record on appeal either the filing in which they made the request or any document summarizing its contents (beyond a passage quoting its title in one of the orders challenged on appeal). We are therefore unable to discern exactly what was sought by Andrea and Tom— whether it be appointment of Andrea alone as special administrator, with authority to employ Tom to assist her; appointment of both; or some other request.

12

The probate judge referred two questions for trial in a civil department: (1) whom to appoint executor and (2) whom, if anyone, to appoint special administrator for the business. Over 11 days in June and July 2019, the court (Buchwald, J.) held a bench trial on those issues. It heard testimony—as summarized above—from Andrea, Dan, Jr., Tom, Eireann, and Heather, as well as Ed Daniels and Ron Collins.

At trial's end, the court previewed its ruling, noting that it would later announce "a further tentative decision," but would first order a settlement conference, so the parties should "know what I think . . . based on the evidence that I've heard." The court listed three "things that are clearest": (1) Dan intended that Andrea run the business; (2) Heather's claim to be a partner in the business (see fn. 3, *ante*) disqualified her as an executor (§ 8402, subd. (a)(5)); and (3) the will made clear "that any one or more than one of the seven children on that list could be appointed as the executor," and "If I were to appoint Andrea as a special administrator [for the business], I would likely appoint [Dan, Jr.] as the executor . . . ."

Addressing Tom directly, the court stated, "I've got to tell you, candidly, I'm very, very reluctant to appoint you as either executor or special administrator of the [business]. [¶] . . . [¶] . . . [Heather] gave some pretty convincing testimony about what happened on the night of [November 27] . . . that's so critical in this case. And . . . her testimony in that regard is corroborated by your own e-mails because . . . the whole tenor of [them] is extremely abrupt and comes off the blocks real hard and very aggressive in a situation where that was just not going to fly. [¶] And so I think that for those reasons . . . you should probably not be involved in the management of either the estate, or if there is a special administrator, the management of the insurance business, even taking into account all your

13

qualifications with respect to all your experience and degrees . . . , which are a rare combination." "[I]t's clear that things went off track in that [November] 27 argument," the court summarized, "and that gives me a lot of concern about having you involved in any aspect of this."

While the settlement conference did not succeed, the court did not issue a statement of decision until September 1, 2021—over two years after the trial.

During that hiatus, Tom and Andrea twice sought interim relief about the business—in fall 2019 and 2020—as yearly policy-renewal deadlines loomed. The court issued two interim/ancillary orders. The first, in 2019, appointed Dan, Jr. interim special administrator of the estate; authorized him to employ Andrea to run the business; ordered Heather to make all files and data available; and ordered that Tom "have no involvement in the operations or management of Bodmann Insurance" (except to speak with Dan, Jr. or Andrea about clients he referred).

In February 2020, Dan, Jr. submitted a declaration resigning as special administrator and withdrawing his request to be an executor, citing "personal family circumstances." The court did not respond.

In its second posttrial order, the court directed Andrea to "attend to the [2020] policy renewals." This order allowed her to "call upon [Tom] to assist her," on the condition that "any and all necessary contacts with [Heather] shall be had by [Andrea], and not [Tom] for reasons the Court has previously expressed." "Under no circumstances," the court specified, "shall [Tom] communicate directly with [Heather]."

In September 2021, the court issued a tentative statement of decision. As foreshadowed, it denied Heather's petition and named Andrea special administrator of the business. As for an executor, the court noted that,

"[w]hile the [will] names all seven adult children as co-executors, appointing all of them is impractical and, given their family disputes here, would result in a 'nightmare' of estate administration," adding that "this point seems to be conceded by both sides[,] who have each proposed selection of . . . just one or two executors." Having "further considered" the children listed in the will "as potential Executors," the court "remain[ed] of the opinion . . . that the best choice for Executor [was Dan, Jr.]," as he seemed the most "neutral and unbiased." The court neither addressed Dan, Jr.'s withdrawal of his request to be an executor nor ruled on his and Tom's joint petition insofar as it had asked that Tom be named an executor.

As to Tom, the court acknowledged that it considered the serious frictions between Tom and Heather, stemming mainly from Tom's "unwarranted aggressive, disrespectful treatment of Heather," and concluded that, in its estimation, such conduct "should and does disqualify [Tom] from being involved in [Andrea]'s administration of the . . . business except in the most limited fashion, as spelled out in [the] interim Orders . . . with regard to annual policy renewals . . . ." The decision went on to point out that "in the first weeks after [Dan's] death Heather . . . was generally cooperative in supporting [Andrea]'s operation of the . . . business. But that changed dramatically in late November 2016 when [Tom] made some aggressive demands for control of the client files and other business records." In a footnote, the court quoted its "statement to [Tom] on the record" that it was "very, very reluctant to appoint [him] either executor or special administrator"; that Heather's testimony about the confrontation was "pretty convincing" and corroborated by the "abrupt," "hard," and "aggressive" tenor of Tom's emails; and that Tom "should probably not be involved in the management of either the estate, or . . . [the] business."

15

Tom objected that the statement denied him a role in administering the estate—"whether [as] executor, special administrator[,] or agent of the special administrator"—"without a legal basis." He pointed out that, while the court resolved Heather's petition and the joint petition as to Dan, Jr., it did not resolve the joint petition insofar as it requested that Tom "be appointed co-executor." While the court made "remarks" about his relationship with Heather, he argued, no "evidence [was] presented at trial to *statutorily disqualify* [him] from being appointed executor under . . . sections 8402 and 8502."

Quoting section 8420, which states that "[t]he person named as executor in the decedent's will has the right to appointment as personal representative," Tom noted that the right subsists unless the person declines appointment or is statutorily disqualified. He quoted (1) the list in section 8402 of disqualifying conditions, which includes "grounds for removal of the person from office under Section 8502" (§ 8402, subd. (a)(3) (section 8402(a)(3))), and (2) the list of grounds for removal in section 8502. Neither list, he noted, includes hostility toward an interested person. He thus asked the court to revise its statement to name him co-executor and specify "conditions" under which he could "participate in Bodmann Insurance," including "that [he] have no direct contact" with Heather. Since 2016, he noted, he had not needed to have such contact "to do what he has been doing to help save [the business]."

In December 2021, the court overruled objections by Tom and Dan, Jr., and reissued its statement without change. As for Dan, Jr., the court held that the probate judge must decide if he could withdraw his petition. As for Tom, it held that the issues and findings he claimed the court had failed to resolve or make were unnecessary. In addressing Tom's claim that the

16

statement "neither denies nor disqualifies [him] from being Executor, except as to his specific disqualification to act as Special Administrator," the court stated that the objection "ignore[s] the limited scope of . . . the referral," which concerned "who should be named Executor" and, if needed, special administrator. Whether Tom was *disqualified* as an executor, the court reasoned, was outside that scope; its rulings appointing Dan, Jr., executor and denying Heather's petition were "adequate for the purpose of ruling on the limited issues referred." As for Tom's objection that there was no legal basis to deny his petition, the court did not cite a code section under which he was disqualified, but instead rejected the objection as "an improper attempt to re-argue the evidence."

The case was subsequently reassigned to Judge Chou. In March 2022, after Beth expressed a willingness to serve as executor and no one objected, the court issued a thorough order vacating Dan, Jr.'s appointments as executor or special administrator; denying Tom's petition to be an executor and declining to lift the interim orders' restrictions on his role in the business; directing Beth to file a petition to be named executor and, pending its resolution, appointing her special administrator, with authority to operate the business with Andrea's help; and ordering Heather to give Beth all business assets, files, and data in her custody or control.

As to Tom, the court noted that Judge Buchwald had "expressly left the issue of whether [Tom's] Petition to be appointed executor should be denied for this Court to decide," which put it "in an odd position," as it "did not hear the 11 days of testimony that informed the prior judge's decision to appoint [Dan, Jr.], but not [Tom], as executor." The court acknowledged that while it was not "in a good position to evaluate the credibility of the witnesses," it did

17

"have the benefit of the express and implied findings of the . . . judge who did see the witnesses."

Specifically, the court noted that, "In concluding that [Tom] should be disqualified 'as it related to the special administration of Bodmann Insurance,' [Judge Buchwald] expressly found that [Tom] engaged in 'unwarranted aggressive, disrespectful treatment of' [Heather] 'as described in the trial record.' In the trial record, that judge further observed that [Tom], in attempting to run Bodmann Insurance, was 'disruptive' and 'not constructive' and that many of the insurance carriers refused to 'deal with' him. As a result, the business of Bodmann Insurance went 'off track' and suffered a significant decline."

The court went on to hold that the "findings by the judge who heard the testimony, reviewed the evidence, and evaluated the credibility of the witnesses [were] more than sufficient to support a conclusion that [Tom] 'mismanaged' Bodmann Insurance, one of the main assets of [the] estate." (Citing § 8502, subd. (a) (section 8502(a)).) The court further noted that Tom "does not appear to dispute that the findings in the [statement of decision] are supported by substantial evidence." Thus, the court held that Tom was "disqualified from serving as executor . . . under sections 8402[(a)(3)] and 8502[(a)][7]" and denied his petition.[8]

---

[7] Section 8502 also authorizes removal, the court noted, if an executor is " 'incapable of properly executing the duties of the office or . . . otherwise not qualified for appointment . . .' (*id.*, subd. (b)), or if '[r]emoval is otherwise necessary for protection of the estate or interested persons' (*id.*, subd. (d))." While the court nominally based its ruling on those provisions as well, its reasoning mainly supports its finding of mismanagement. We rely solely on that finding to affirm and do not further discuss the other factors.

[8] The court also set forth an alternative rationale based on the doctrine of implied findings. We do not rely on or discuss that rationale.

18

Tom appealed.[9]

## DISCUSSION

While the parties offered evidence of many facts and raised many legal issues at the 11-day trial, this appeal turns on a single, narrow question: Did the court abuse its discretion in holding that Tom's treatment of Heather amounted to "mismanag[ing] . . . the estate" in a way that would warrant his removal as an executor under section 8502(a), and which thus disqualified him under section 8402(a)(3) from being appointed an executor?[10]

### *Standard of Review*

We review the court's determination that Tom could have been removed, and hence was disqualified, for abuse of discretion. (*Estate of Sapp* (2019) 36 Cal.App.5th 86, 103; *Estate of Hammer* (1993) 19 Cal.App.4th 1621, 1633–1634.) Under this standard, the question "is not whether we would have made a different decision had the matter been submitted to us in the first instance" but whether, "under all the evidence, viewed most favorably in support of the trial court's action, no judge reasonably could have reached the

[9] Tom first appealed Judge Buchwald's order overruling his objections to the tentative statement of decision and then appealed Judge Chou's order denying his petition and reaffirming the restrictions on his role. Tom moved to consolidate the appeals, while Heather moved to dismiss the first as taken from an unappealable order. We granted Tom's motion and denied Heather's.

[10] Tom also purports to challenge Judge Buchwald's denial of a motion in limine to exclude evidence of the unsigned trust documents, contending that a court cannot give testamentary effect to an instrument that a decedent did not execute. (*Estate of Twohig* (1986) 178 Cal.App.3d 555, 560.) But in limine rulings are not appealable. (*Sheehy v. Chicago Title Ins. Co.* (2025) 108 Cal.App.5th 178, 182.) While we can still review such a ruling insofar as it affects the correctness of a later, appealable order (*ibid.*), Tom fails to articulate how any alleged error in admitting evidence about the unsigned trust—which the court admitted only for potential aid in construing ambiguities in the layperson-drafted holographic will—could have prejudicially affected the content of an appealable order.

challenged result." (*Estate of Billings* (1991) 228 Cal.App.3d 426, 430.) Given the unusual course of proceedings below, the exact contours of our standard of review are significant. "The abuse of discretion standard is not a unified standard; the deference it calls for varies according to the aspect of a trial court's ruling under review. The trial court's findings of fact are reviewed for substantial evidence, its conclusions of law are reviewed de novo, and its application of the law to the facts is reversible only if arbitrary and capricious." (*Haraguchi v. Superior Court* (2008) 43 Cal.4th 706, 711–712 (*Haraguchi*), fns. omitted.)

### *Failure To Apply the Correct Legal Standard*

Tom's first challenge is to Judge Buchwald's December 15, 2021, statement of decision. Tom argues that the court failed to apply the correct legal standard in disqualifying him as an executor of the estate.

The law is clear that a named executor has a "*right* to appointment in the absence of express statutory grounds for disqualification." (*Estate of Backer* (1985) 164 Cal.App.3d 1159, 1163, overruled in other part by statute as stated in Cal. Law Revision Com. com., 53A West's Ann. Prob. Code (2018 ed.) foll. § 8402, p. 216 (Law Rev. Com. com.) (*Backer*).) The grounds for disqualification in section 8402 (including those incorporated by reference from section 8502) are exclusive. (*Backer,* at p. 1162.) In the absence of an express statutory ground for disqualification, a probate judge must appoint a named executor and has " 'no discretion to exercise in the matter.' " (*In re Estate of Bauquier* (1891) 88 Cal. 302, 309.) Under section 8402(a)(3), a person is disqualified if, among other reasons, "[t]here are grounds for removal of that person from office under Section 8502." A court is thereby enabled to "deny appointment of a personal representative [who] would be subject to removal [under section 8502]." (Law Rev. Com. com.) Under

20

section 8502, "[a] personal representative may be removed from office" if they have "mismanaged . . . the estate." (§ 8502(a).)

Tom argues that rather than basing its order on statutory grounds for disqualification, the court failed to recognize the law that constrained its discretion in choosing whom to appoint and instead based its decision "on the erroneous view that unpleasant feelings between [Tom] and Heather" were sufficient to support Tom's disqualification.

It is true that one way in which a court can abuse its discretion is to apply the wrong legal standard to the facts. (*People v. Knoller* (2007) 41 Cal.4th 139, 156; *In re Carmaleta B.* (1978) 21 Cal.3d 482, 496, superseded on other ground by statute as stated in *In re Amie M.* (1986) 180 Cal.App.3d 668, 673.) The problem with this argument, however, is that, even if Judge Buchwald did fail to recognize the constraint imposed by section 8420,[11] it is

---

[11] The statement of decision suggests Judge Buchwald believed he had discretion to choose the *best* executor from among the seven named, rather than being obliged by section 8420 to appoint *each* named executor who had not renounced appointment or been disqualified under section 8402. "While the [will] names all seven adult children as co-executors," the statement notes, the court felt—and the parties "seem[ed] to . . . concede[]"—that "appointing all of them is impractical" and would yield "a 'nightmare' of estate administration." Having considered those listed "as *potential* Executors," the court stated, it thought "the *best* choice for Executor is [Dan, Jr.]." (Italics added.) Insofar as the court implied that Tom had conceded it need pick just one executor and could deny his petition if it found another named person a *better* choice, it was mistaken: Tom clearly asserted a right to be appointed if not disqualified.

(The text of section 8420, we note, assumes a will naming *one* executor: "*The person named* as executor in the . . . will has the right to appointment . . . ." (Italics added.) The implicit premise of Tom's argument is that, if a will names multiple executors, section 8420 applies to *each*, seriatim, as if each were "[t]he person named" in a will naming *one* executor. No one has disputed this premise or briefed the potentially novel question of statutory

21

Judge Chou's order that denied Tom's petition to serve as an executor. That order makes unmistakably clear that Judge Chou did understand, and expressly applied, the proper statutory framework cited by Tom on appeal.

In terms of the tripartite model of *Haraguchi*, *supra*, 43 Cal.4th at pages 711–712, Judge Chou adopted the factual findings made by Judge Buchwald, identified the proper legal standard governing whether Tom was disqualified, and exercised his discretion to apply that standard to the facts thus found. The result was a ruling that Tom's conduct amounted to a ground for removal—having mismanaged the estate—listed in section 8502 and incorporated by reference in section 8402. There was no error of law.

### *Tom's Conduct Amounted to Mismanagement of the Business.*

Tom next contends that Judge Chou abused his discretion in applying the relevant standard because the conduct in which Judge Buchwald found that Tom engaged cannot amount to having "mismanaged . . . the estate" (§ 8502(a)). He asserts that "[a]t most," the evidence showed "friction in his relationship with Heather"; contends that "ill will or friction" with an interested person is not a statutory disqualifying factor; and summarizes decisions assertedly showing that a named executor can be disqualified only "under a strict reading of the statutory criteria," while rejecting such nonstatutory bases as "ill feeling" (*Estate of Shimun* (1977) 67 Cal.App.3d 436, 442), prejudice against some heirs (*Estate of Wright* (1918) 177 Cal. 274, 277), or conflicts of interest (*Backer*, *supra*, 164 Cal.App.3d at p. 1161). We find this argument unpersuasive.

Neither Judge Buchwald, in his statement of decision limiting Tom's role in the business and declining to appoint him an executor, nor—more

---

interpretation that it raises, and we need not answer the question to resolve this appeal, so we assume without deciding that the premise is correct.)

importantly—Judge Chou, in his order denying Tom's petition to be an executor, did so simply because of "friction." Rather, they did so because of the detrimental effect that this "friction" had on the business.

The statement of decision referred to "serious frictions" not just *existing*, but having "at times carried the day." The statement of decision observed that, "in the first weeks after [Dan died, Heather] was generally cooperative in supporting [Andrea]'s operation of the . . . business. But that changed dramatically . . . when [Tom] made some aggressive demands . . . ." In a footnote appended to that sentence, Judge Buchwald quoted what he had told Tom at trial's end to explain his unwillingness to make him executor or special administrator: It was " 'clear that things went off track in that [November] 27 argument,' " which gave the court " 'a lot of concern about having [Tom] involved in any aspect of this.' " The "frictions," in sum, did not just cause Heather emotional distress; they sent the business "off track." And because those "unproductive frictions" stemmed "mainly from [Tom]'s unwarranted aggressive, disrespectful treatment of Heather," his conduct disqualified him from a role in running the business "except in the most limited fashion."

Judge Chou, in turn, assessed those findings using the standards of sections 8402(a)(3) and 8502(a) and concluded that Tom's treatment of Heather amounted, under the circumstances, to having "mismanaged . . . the estate" (§ 8502(a)). Noting that mismanagement need not entail fraud or willful harm, but "merely that the business of the estate has been badly, improperly, or unskillfully conducted" (*Estate of Palm* (1945) 68 Cal.App.2d 204, 210), Judge Chou quoted Judge Buchwald's observations that, "in attempting to run Bodmann Insurance," Tom was " 'disruptive' and 'not constructive' "; that "many . . . insurance carriers refused to 'deal with' him";

23

and that "[a]s a result, the business of Bodmann Insurance went 'off track' and suffered a significant decline." Those findings, Judge Chou held, were "more than sufficient to support a conclusion that [Tom] 'mismanaged' Bodmann Insurance," an estate asset, under section 8502(a). Judge Chou found Tom disqualified, in sum, not just because he had created ill will and friction, but because that ill will and friction had harmed the business.

In response, Tom argues that applying sections 8402(a)(3) and 8502(a) was a "brainstorm of the trial court . . . not proposed or discussed by the parties." He points out that Heather did not raise those provisions in opposing his petition. Although that is true, Judge Buchwald's statement of decision had conveyed, in substance, the same rationale that led Judge Chou to apply those provisions. As quoted, the statement found that "unproductive frictions stem[ming] mainly from [Tom]'s unwarranted aggressive, disrespectful treatment of Heather . . . disqualif[ied] [Tom] from being involved in [Andrea]'s administration of the . . . business except in the most limited fashion," as Heather had been largely "cooperative in supporting [Andrea]'s operation of the . . . business" until Tom made "aggressive demands" in an "abrupt" "hard," "disrespectful" way—leading the court to conclude that he "should probably not be involved in the management of either the estate. . . [or the] business." While the statement did not cite sections 8402(a)(3) or 8502(a), its gravamen was that Tom had disrupted the business and thus should not be allowed to manage it, let alone the entire estate. Judge Chou simply identified the proper statutory label for that rationale. On appeal, Tom identifies no different evidence he could have marshalled, or other legal arguments he could have made, had Heather cited section 8502(a).

24

***Tom's Conduct Demonstrated His Involvement in the
Management of the Business.***

Tom next argues that "[t]he 'mismanagement' section" of section 8502 should be applied only "when an individual [has] actually [been] entrusted with the management of the estate." For this proposition, Tom cites two cases that long predate the 1988 enactment of section 8402(a)(3), which for the first time authorized a probate court to decline to appoint a named executor because they would be subject to removal under section 8502. (*Estate of Tersip* (1948) 86 Cal.App.2d 43; *Estate of Gainfort* (1938) 11 Cal.2d 298, 300; see § 8402, Law Rev. Com. com.) In each of those older cases, a probate court had first appointed an administrator before later removing them, under a predecessor of section 8502(a), for mismanagement or other misconduct. (*Tersip*, at p. 44; *Gainfort*, at pp. 299–300.) But neither decision addressed whether a court may decline in the first instance to appoint a named executor on the ground that, while acting under color of the will's authority before being appointed, the person had mismanaged the estate.

The Third District grappled with a similar issue 40 years ago in *Backer*, *supra*, 164 Cal.App.3d 1159. In *Backer*, decedent's brother petitioned to be named as the executor of decedent's estate pursuant to the instructions in a will decedent had executed decades earlier, before he married and had children. (*Id.* at pp. 1160–1161.) Decedent's sons objected based on a conflict between decedent's brother and the estate over a farm of which the brother claimed sole ownership, but in which the sons claimed, on behalf of the estate, a partial interest. (*Id.* at p. 1161.)

In reversing the trial court's denial of the brother's petition, the Court of Appeal held, albeit reluctantly, that a conflict of interest between the named executor and the estate was not a ground to justify disqualification because such ground was not among those listed in the Code. (*Backer*, *supra*,

25

164 Cal.App.3d at pp. 1161, 1164.)  Citing *In re Estate of Bauquier, supra,* 88 Cal. 302, the court applied the rule that "absent a showing that the person is incompetent under one or more of the exclusive statutory grounds," which did not include adverse claims, a beneficiary's only recourse would be that "[i]f, following appointment, the executor advances his self-interest at the expense of the estate, the court then has the power to remove him." (*Backer*, at pp. 1162–1163, citing *Bauquier*, at p. 313.)

Acknowledging that making decedent's brother executor would put him in the "impossible position of asserting his exclusive ownership of the property while under a fiduciary duty to the estate to bring an action against himself asserting joint ownership," the court observed that this would "appear to constitute grounds for [his] *removal . . .* as executor." (*Backer, supra,* 164 Cal.App.3d at p. 1164.)  A "more prudent use of judicial recourses," the court noted, would be to allow judges in such cases "to refuse appointment in the first instance." (*Ibid.*)

In 1988, the Legislature responded by enacting section 8402(a)(3). (Stats. 1988, ch. 1199, § 81.5; see Law Rev. Com. com.)  It added to the list of reasons a person "is not competent to act as personal representative," that "[t]here are grounds for removal of the person from office under Section 8502." (§ 8402(a)(3).)  That provision, the Law Revision Commission stated, "enables the court to deny appointment of a personal representative [who] would be subject to removal, for example, for a conflict of interest," which "would reverse the result in cases such as [*Backer*]." (§ 8402, Law Rev. Com. com.)

*Backer* remains good law insofar as it states the general rule that a named executor " '*has the right to act unless . . . some express provision of law . . . declares that he shall not.*' " (*Backer, supra,* 164 Cal.App.3d at

26

p. 1162.) Section 8402(a)(3) simply created a new "express provision of law" declaring an instance in which a named executor does *not* have the right to act—namely, that they would be subject to removal, if appointed, under section 8502. Here, the court exercised its authority under section 8402(a)(3) in ruling that Tom was disqualified because he would be subject to removal under section 8502(a) for having "mismanaged . . . the estate."

Tom does not acknowledge the post-*Backer* amendment designed to avoid compelling courts to appoint executors whose situation or past conduct would promptly warrant their removal. Tom's contention that section 8502(a) can apply only to a person who had been formally appointed executor would tend in part to negate the 1988 amendment incorporating section 8502 by reference in section 8402. And it would entail the same wasteful formalism that the *Backer* court decried, and the Legislature amended the statute to avoid. While the court here had not authorized Tom to act as executor or special administrator, his testimony and conduct make clear his belief that he was acting under authority of the will, which directed Andrea to maintain the business, and under Andrea's authority as an employee of Bodmann Insurance. In Tom's view, she delegated her authority to him, and in dealing with Heather, he exercised that authority.

Tom acknowledged at trial that, beginning in 2016, he had identified himself online, in business and political contexts, as the "chief operating officer" of Bodmann Insurance. Asked who appointed him, he identified Andrea. And his first email to Heather the day after the confrontation— tellingly titled, "Bodmann Insurance email policy"—made plain his view of his authority, stating: "Please be advised immediately that you are not to send outbound emails via the Dan@BodmannInsurance.com email account," and "Starting immediately, the email policy for your continued involvement

27

at Bodmann Insurance, if any, requires that you cc all outbound emails to [addresses]." Those are the words of someone who believes he has authority to manage a business, not a stepson offering helpful suggestions.

Just as it was wasteful to require a court to appoint a named executor with a clear conflict of interest, only to then remove them under section 8502 (see *Backer*, *supra*, 164 Cal.App.3d at p. 1164), so too would it be wasteful to require a court to appoint a named executor who had already mismanaged an estate while acting on a *belief* that he had authority to manage it, simply because he had not yet been appointed and had thus not *truly* had authority. The fact that Tom badly managed an estate asset while exercising only a purported authority to do so makes his conduct a *more* fit basis, not less, to decline to appoint him executor and thus actually give him such authority.

### *The Trial Court's Application of Section 8502(a) Was Based on the Record.*

Lastly, Tom argues that Judge Chou's application of section 8502(a) in his order is "based on representations of the record by Heather's attorney, not the record itself." Tom evidently means that Judge Chou relied on excerpts from trial transcripts attached to the attorney's declaration. Tom describes Judge Chou's order as stating that he "was attempting to run Bodmann Insurance in a 'disruptive' and 'not constructive' way[,] and that insurance carriers 'refused to "deal with" him.' " Those snippets, he argues, are "based on Heather's attorney's declaration," which "does not conform to the record" because the statement of decision does not mention such factors, which thus "cannot be considered findings of [Judge Buchwald]." This claim is, for the most part, unfounded and, in its entirety, insufficient to show prejudicial error.

As for the comment that Tom's conduct was " 'disruptive' and 'not constructive,' " Judge Chou's order accurately quoted the transcript in which

28

Judge Buchwald, albeit without making a formal factual finding, twice pointed to evidence that Tom's efforts to obtain records and manage a transfer of broker-of-record status were "disruptive" and not "constructive."

First, in overruling a relevance objection to a question about whether selling the business would have been beneficial, Judge Buchwald said, "there's evidence about [Tom] being pretty disruptive rather than constructive at the time that the [challenged] question is focused on. [¶] . . .[T]hat's an issue in the case for the purposes of evaluating who ought to really have the hands-on administration of the estate at this time . . . ."

Second, during Tom's counsel's closing argument, Judge Buchwald addressed counsel, noting that "the way that [Tom] handled all of this creates . . . a big wedge of commotion that's not *constructive*, and it seems to me on a commonsense basis was not any way to be trying to get Heather's cooperation. And . . . all of that backfired, and Heather went her own way. [¶] And what would be wrong with my making findings to that effect, based on the evidence that I've heard? And wouldn't all of that mean that the last person who should have any role here either as executor or as a special administrator of the insurance business is [Tom], who's already been, arguably, more than *disruptive* here because the end result is that the family had a six-figure business . . . [they might have sold]? [¶] But . . . there's radio silence from Andrea, and in that void, [Tom] is acting . . . in a way that really puts off Heather . . ., and the result of all this is really tragic, . . . a relatively healthy . . . business [has] declined to the point where nobody seems optimistic about it being turned around." (Italics added.)

While Judge Buchwald did not formally find Tom "disruptive" and not "constructive," his comments were relevant in construing the findings he did make, which were to similar effect. One can easily relabel "unwarranted

29

aggressive, disrespectful" conduct, of the sort in which Judge Buchwald found Tom had engaged, as "disruptive" and not "constructive."

Tom's further contention—that Judge Chou's reliance on the comment that carriers were "saying that we can't deal with [Tom]," was based on a declaration by Heather's attorney "which does not conform to the record"—is also without merit. Tom does not support this conclusory statement with any explanation of just how it fails to conform to the record.[12] To the contrary, it appears that Judge Chou's order accurately quoted the transcript. Tom is correct that in making this statement, Judge Buchwald was not claiming that the carriers were refusing to speak to Tom because of any improper or impolitic behavior on his part towards the carriers. Rather, Judge Buchwald was simply acknowledging that the carriers would not speak to Tom because they "recogniz[ed] [Heather] as the interim of[-]record operator of the business"—an interpretation of the transcript in which Heather's brief on

---

[12] Tom implies that Heather's counsel somehow misled Judge Chou into taking the comment out of context. He describes Judge Chou's order as "based on representations of the record by Heather's attorney, not the record itself" and its quotation of Judge Buchwald as "based on Heather's attorney's declaration, which does not conform to the record." But Tom did not designate for the record on appeal the declaration by Heather's attorney that Judge Chou cited in quoting what Judge Buchwald had "observed." Applying the presumption that officials regularly perform their duties (Evid. Code, § 664; *Elena S. v. Kroutik* (2016) 247 Cal.App.4th 570, 575) (i.e., here, that Judge Chou relied only on admissible evidence), and applying as well our bedrock presumption that a challenged order is correct unless an appellant bears the burden of providing a sufficient record to demonstrate prejudicial error (*Jameson v. Desta* (2018) 5 Cal.5th 594, 608–609), we assume that the exhibit Judge Chou cited was a properly authenticated copy of an excerpt from the transcript recording Judge Buchwald's observation. Nothing suggests that Judge Chou relied instead on an inaccurate or misleading paraphrase by counsel, and the quotation of Judge Buchwald in Judge Chou's order matches the transcript in the record on appeal.)

appeal concurs. Tom seems to be arguing that, because Judge Buchwald did not find that Tom had done anything improper to *cause* the carriers to refuse to speak to him, it was improper for Judge Chou to rely on this comment to support a finding that Tom mismanaged the business. We disagree.

Although the carriers' unwillingness to deal with Tom, as a non-employee of Bodmann Insurance, was indeed a neutral background circumstance and not a further, independent indicium of unfitness, it was still indirectly a result of Tom's alienation of Heather. It thus further demonstrated how his handling of that situation had been detrimental to the business and was therefore appropriately considered by Judge Chou to support a finding that Tom mismanaged the business.

In any event, all other relevant parts of the record—Judge Buchwald's express finding about how Tom treated Heather, and how that in turn impaired the business; his observations about the evidence of Tom being disruptive rather than constructive; and the trial transcript itself—strongly support our conclusion that Judge Chou did not abuse his discretion under sections 8402(a)(3) and 8502(a).

The backdrop of that conclusion is Tom's own testimony about his view of the nature of Bodmann Insurance as a business, and of what was needed to transfer control successfully from Heather to Andrea: An "essential part of the brand of Bodmann Insurance" as a "neighborhood, trustworthy" agency was that it had been run personally by Dan and Heather to serve the friends and neighbors with whom they met in their kitchen and had "a personal relationship." Tom thus saw securing Heather's cooperation, or at least ensuring she would "not disrupt" the transition, as a vital part of the task Andrea had delegated to him, pursuant to the authority he thought the will had given *her*. That task was to arrange a transfer of broker-of-record status

as the first step in a transfer of the business. Tom knew it would "add value to the company if [Heather] was cooperating during the transfer." Indeed, he deemed it "critically advisable to work with Heather to the extent possible to effect the transition." He thus "tr[ied] to appeal to her to cooperate with us, knowing that this is a very personal business." Yet despite that understanding, Tom ultimately treated Heather with an aggressive disrespect that any reasonable person would have known was destined to alienate her and send the transition, and thus the business, "off track"—as it did.

Mismanaging an estate need entail only conducting its business "badly, improperly, or unskillfully." (*Estate of Palm*, *supra*, 68 Cal.App.2d at p. 210.) Given Tom's own belief that it was "critically advisable" to secure Heather's cooperation, Judge Chou acted within his discretion in concluding that the outburst of verbal abuse in which Tom nonetheless let himself engage— followed by the breathtakingly arrogant, peremptory emails in which he commanded Heather, in granular detail, to do or not do things regarding a business she and his father had run together for nearly three decades— amounted to badly, improperly, or unskillfully pursuing a business objective Tom had set for himself and identified as critical. The record supports Judge Buchwald's observation that the November 27 confrontation sent the business "off track," and substantial evidence supports his factual finding that Tom's "unwarranted aggressive, disrespectful treatment" of Heather caused the derailment. Given those facts,[13] Judge Chou did not abuse his discretion in applying sections 8502(a) and 8402(a)(3) as he did.

---

[13] In fairness, we acknowledge that Tom and at least two of his siblings gave a very different account of the facts. In their view, Heather consistently obstructed the transition—acting from, at best, incompetence and confusion or, at worst, a bad faith desire to retain control of the commission income

**DISPOSITION**

The orders on appeal are affirmed.  Heather Holden-Bodmann shall recover costs on appeal.  (Cal. Rules of Court, rule 8.276.)

---

while pursuing her own claims to the business.  On this account, Tom—who sought only to help his sister fulfill her charge to preserve their father's legacy—eventually gave in to a frustration for which Heather was culpably responsible, in a situation in which no amount of patient diplomacy could have yielded a better outcome.  It may be that their account, and not Heather's, is true; it is not our role to choose.  We simply accept the factual findings of the judge who observed the witnesses, as those findings undisputedly rest on substantial evidence, and conclude that Judge Chou did not err in identifying the applicable legal standard, and did not act arbitrarily or capriciously in applying that standard to those findings. (*Haraguchi, supra*, 43 Cal.4th at pp. 711–712.)

CLAY, J.*

We concur.

BROWN, P.J.

STREETER, J.

*Estate of Bodmann* (A164552, A164876)

---

* Judge of the Superior Court of California, County of Alameda, assigned by the Chief Justice pursuant to article VI, section 6 of the California Constitution.

**CERTIFIED FOR PUBLICATION**
COURT OF APPEAL, FIRST APPELLATE DISTRICT
350 MCALLISTER STREET
SAN FRANCISCO, CA 94102
DIVISION 4

Estate of DANIEL W. BODMANN, Sr., deceased.

_____

THOMAS E. KROUSE, JR.,
Petitioner and Appellant,
v.
HEATHER HOLDEN-BODMANN,
Objector and Respondent.

HEATHER HOLDEN-BODMANN,
Petitioner and Respondent,
v.
THOMAS E. KROUSE, JR.,
Objector and Appellant.

Appeal No. A164552, A164876
San Mateo County Super. Ct. Nos. 17PRO00952, 17PRO00080, 17PRO00952C

_____

BY THE COURT:

On November 12, 2025, appellant filed a petition for rehearing. The petition for rehearing is denied.

On October 31, 2025, the court received a request from counsel for respondent requesting partial publication of the opinion filed on October 28, 2025, pursuant to California Rules of Court, rules 8.1110 and 8.1112(a)(1). That request is granted in part; the opinion is ordered fully published.

(Brown, P.J., Streeter, J., and Clay, J.* participated in the decisions.)


Date: _____          _____
    * Judge of the Superior Court of California, County of Alameda, assigned by the Chief Justice pursuant to article VI, section 6 of the California Constitution.

1

Trial Court:          San Mateo County Superior Court

Trial Judges:         Hon. Gerald Buchwald, Hon. Danny Y. Chou

Counsel:              David A. Kay for Appellant.


                      Hansen Law Firm, P.C., Craig A. Hansen, Philip E. Yeager,
                      Collin D. Greene for Respondent.